DA 07-0686

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 424

JASON SINCLAIR,

       Plaintiff and Appellant,

   v.

BURLINGTON NORTHERN AND SANTA FE
RAILWAY COMPANY, a Delaware Corporation,
and SCOTT JACOBSEN,

       Defendants and Appellees.

APPEAL FROM:    District Court of the Eighth Judicial District,
                      In and For the County of Cascade, Cause No. ADV 2004-242
                      Honorable Julie Macek, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Erik B. Thueson, Thueson Law Office, Helena, Montana

              James T. Towe, Towe Law Offices, Missoula, Montana

       For Appellees:

              Jeff Hedger, James E. Roberts, Hedger Friend & Roberts, P.L.L.C.,
              Billings, Montana

Submitted on Briefs:  September 23, 2008

Decided:  December 16, 2008

Filed:

_____
                     Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     Jason Sinclair (Sinclair) appeals the dismissal of his claims against Burlington Northern and Santa Fe Railway Company (BNSF) in the Eighth Judicial District, Cascade County. We affirm in part, reverse in part and remand for further proceedings consistent with this Opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2     Sinclair was an employee of BNSF from 1994 to 2001. In December 2001, Sinclair reported to BNSF that he had sustained injuries during his employment. He attributed his injuries to a Freightliner FL-80 truck in which he rode regularly in order to perform his job. BNSF denied liability for the injuries. Sinclair consequently filed a claim under the Federal Employer's Liability Act (FELA), 45 U.S.C. § 51, on January 7, 2002, in the Eighth Judicial District Court. Sinclair sought damages for cumulative trauma due to riding in the FL-80 work truck and damages due to a separate slip and fall injury. Discovery proceeded and the case went to trial on March 10, 2003.

¶3     On the third day of trial, the parties settled. At that time, Sinclair signed a Release and Settlement Agreement with BNSF. The release stated that Sinclair would "release and forever discharge" BNSF and any of its predecessor, successor, or affiliated companies "from all claims and liabilities of every kind of nature, **INCLUDING CLAIMS FOR INJURIES, ILLNESSES OR DAMAGES, IF ANY, WHICH ARE UNKNOWN TO ME AT THE PRESENT TIME** . . . ." The release then listed two specific work-related accidents which occurred while Sinclair was working as a truck driver for BNSF. The release also contained clauses "C" and "D," releasing:

C.    Any and all claims, suits, demands, actions, damages, costs and expenses of any type, past present or future, known or unknown, which have been made or which could have been made, which I, Jason O. Sinclair, [have] by reason of any physical, psychological, mental or emotional claims, stress, cumulative trauma and repetitive motion injuries, bilateral carpal tunnel syndrome, labor claims, claims under the American with Disabilities Act, including claims for negligent mismanagement or claims that could potentially be made pursuant to MCA 39-2-703 or any similar state or federal law, civil rights claims, federal or state employment statutes, or any other claims relating to any employment practices, claims handling practices, occupational hearing loss, hearing impairment, tinnitus, hearing disorders of any type, including any increased risk of further hearing disorder, and any respiratory, immunological, neurological, organic, or organ condition, injury, illness or disease caused or aggravated by exposure to stress, occupational exposures to fumes, chemicals, smoke, dust, gases, heavy metals, or any other substances or situation while employed by [BNSF] including any claim for present or future reinstatement which I hereby expressly waive and release.

D.    It is agreed and understood that the claims which were or could have been made or brought by Jason O. Sinclair, including, but limited to, injuries to the spine, brain and any other cumulative injuries for claims for other injuries or illnesses referenced in the medical records or described by Jason O. Sinclair in his lawsuit are herein released.

¶4    During discovery in his suit against BNSF, Sinclair had requested information and documents concerning problems with the FL-80 truck. Sinclair claims that BNSF did not produce any information indicating any major problems with the FL-80 truck, and that BNSF's claims adjustor Scott Jacobson (Jacobson) verified BNSF's discovery responses. Sinclair's trial counsel made additional discovery requests in this regard, but Sinclair claims nothing further was produced. As it turns out, a co-worker of Sinclair named Mike Dolan (Dolan) had filed a similar suit against BNSF, alleging that he had been injured from riding in an FL-80 truck. Dolan also made discovery requests with BNSF concerning the FL-80 truck. After deposing Jacobsen, Dolan learned of additional

3

information, not heretofore disclosed neither to himself nor Sinclair, concerning the FL-80 truck in connection with a lawsuit in Missouri against BNSF. Dolan then contacted attorneys involved in the Missouri litigation and obtained information concerning the FL-80 truck. Sinclair claims that the information obtained by Dolan shows that BNSF had safety complaints and back injury reports about the FL-80 truck dating back as far as 1999. Sinclair also claims that further discovery by Dolan revealed that BNSF had knowledge that the FL-80 truck was responsible for back injuries to its employees.

¶5 Because he did not learn of the foregoing information until after his suit against BNSF had settled, Sinclair filed a new complaint against BNSF on March 9, 2004. In it, he contended that before and during his trial, BNSF had represented to him and the jury that the FL-80 was a safe truck when, in fact, it knew otherwise. Sinclair contended that BNSF knew about problems with the FL-80 truck and failed to produce this information to him in response to his discovery requests.

¶6 Sinclair's new complaint initially contained five counts. Count I asserted a new cause of action for negligence against BNSF, alleging that Sinclair had been overexposed to poisonous or hazardous fumes, vapors, dust, and particles while he performed his duties as a welder for BNSF. Sinclair alleged that BNSF had failed to provide him with appropriate respiratory protection when he performed some welding for BNSF in 2001, and that during this time he was exposed to toxic manganese fumes. Sinclair alleged in this new count that he suffered subtle neurotoxic damages over the course of his career, but was unaware of this damage until 2003 when he was advised that several symptoms

4

he had been suffering (including tremors in his hands, balance difficulties, and weakness in his legs) had been caused by overexposure to toxic fumes at his workplace. Sinclair further alleged that BNSF had knowledge of Sinclair's potential susceptibility to injury from chemical exposures dating back to at least 1996.[1]

¶7 Count II stated a bad faith claim in which Sinclair alleged BNSF violated its duty to act promptly, fairly, and in good faith to settle his claim. In particular, Sinclair alleged that BNSF withheld information it had concerning the FL-80 truck during discovery in the initial suit which, if revealed, would have shown that liability was clear, causation was clearly established, and that BNSF's defenses were not meritorious. Sinclair claimed that the withholding of this information during his previous lawsuit affected his ability to present his case to the District Court and the jury, and ultimately led to his acceptance of a settlement for less than a reasonable and fair amount.

¶8 Count III stated a fraud claim. In this count, Sinclair alleged that BNSF's failure to provide information requested by him concerning its knowledge of the FL-80 truck constituted fraud under Montana law. Sinclair alleged that BNSF knew that the withheld information concerning the FL-80 truck had a direct bearing on the validity of its defenses, as well as liability and causation. In spite of this, Sinclair claims that BNSF took positions on the safety of the FL-80 truck which were contrary to its internal

---

[1] In Count I, Sinclair also alleged that BNSF negligently assigned him to numerous tasks in the course of his welding duties which resulted in repetitive use trauma to his arms and upper extremities, and that BNSF was responsible for damages from these injuries on account of its negligence. However, on appeal he has exclusively focused on the manganese poisoning allegations, and made virtually no mention of these repetitive trauma claims. Accordingly, we will confine our review solely to the manganese poisoning claims.

documents, and caused him to settle for a lesser amount than he would have if he had known this information. Sinclair alleged that BNSF perpetrated a fraud both upon him and the court, and that BNSF breached its duties under both Montana common and statutory law in concealing this information from him in order to gain an unfair advantage. Count IV stated a punitive damages claim, stemming from BNSF's alleged attempts to conceal information pertaining to the liability and causation issues involved in Sinclair's lawsuit.

¶9 Count V, entitled "release issues," related to the release which Sinclair signed when he settled his previous suit. Sinclair alleged the release was overly broad, unconscionable, not supported by adequate consideration, and based on concealment, deceit, fraud, and mutual mistake of fact. Accordingly, Sinclair asserted the release could not be asserted as a defense to any of his present claims against BNSF. Sinclair asserted that he was unaware of any system-wide problems with the FL-80 truck and that if BNSF and Jacobsen were similarly unaware of such information, then the release was based upon a mutual mistake of fact. Finally, he specifically alleged that the injury claims asserted in his new complaint were not at issue in his previous trial, had not been diagnosed, and thus were not part of the earlier settlement and accompanying release.

¶10 BNSF subsequently moved the District Court to dismiss Counts II, III, and IV of Sinclair's complaint. On November 16, 2004, Sinclair amended his complaint, adding an alternative claim under FELA (alternative FELA claim). This claim reads in pertinent part as follows:

BNSF negligently assigned Mr. Sinclair to unsafe work practices, tools and equipment over the course of his career, including but not limited to, the FL-80 truck described above. The BNSF knew that this and identical trucks were dangerous and causing back injuries to its workforce, yet concealed this information from Mr. Sinclair and other workers. Mr. Sinclair was further negligently required to perform other heavy, awkward, and repetitive work activities over the course of his career.

BNSF's negligence based on the information currently available included failure to provide a safe workplace, tools and equipment, failure to train or warn Mr. Sinclair, failure to provide adequate assistance for doing the work, and the general failure to act reasonably under the circumstances.

BNSF's negligence under the FELA caused, in whole or in part, injuries to Sinclair's spine and related general damages that are recoverable under the FELA.

Sinclair maintains that he added this claim to his complaint after BNSF filed its motion to dismiss his state law claims, so that if those claims were dismissed, he would be entitled to rescind his back injury settlement on the grounds of fraud and re-litigate his FELA case.

¶11 The District Court granted BNSF's motion to dismiss on February 10, 2006. The District Court concluded that Count II, the bad faith claim, was unripe while the underlying validity of the FELA release remained at issue, and dismissed that claim without prejudice. The District Court dismissed Sinclair's state law fraud claims on the theory that those claims were preempted by federal law under FELA; thus, Sinclair could not simultaneously affirm the validity of his release and independently pursue state law claims related to fraud. Then, because it dismissed both the fraud and bad faith claims, the District Court dismissed the corresponding punitive damages claims as well.

7

¶12     After granting BNSF's motion, the District Court issued an order regarding further discovery on issues related to the remaining counts in Sinclair's complaint. Subsequent to discovery, both parties moved for summary judgment on Sinclair's remaining FELA claims. The District Court held a hearing on June 5, 2007, and granted summary judgment to BNSF from the bench on the remaining counts in Sinclair's complaint. The rationale for the District Court's decision is set forth in the transcript of the June 5 hearing.

¶13     The District Court explained that the United States Supreme Court decision of *Dice v. Akron, Canton & Youngstown R. R. Co.*, 342 U.S. 359, 72 S. Ct. 312 (1952), set forth the grounds under which a release could be set aside for fraud in the inducement and that Sinclair had failed to meet this standard because he had not set forth any allegations claiming that he was deceived by BNSF as to the contents of the release itself. Similarly, the District Court found that Sinclair had failed to properly allege a mutual mistake of fact, or that the release was not supported by adequate consideration. The District Court concluded that there were no genuine issues of material fact which would allow it to invalidate the release under the standards set forth in *Dice.*

¶14     Additionally, the District Court considered whether the scope of the release violated § 5 of FELA, which reads in pertinent part as follows:

> Any contract, rule, regulation or device whatsoever, the purpose or intent of which shall be to enable the common carrier to exempt itself from any liability created by this Chapter, shall to that extent be void . . . .

45 U.S.C. § 55.[2]

¶15     With respect to the scope of the release, the District Court concluded as a matter of law that the release did not violate § 5 of FELA, covered Sinclair's manganese poisoning injuries as alleged in Count I, and therefore prevented Sinclair from litigating those claims any further.  The District Court found that when he signed the release, Sinclair knew that he was having symptoms which could be related to manganese poisoning and that he was also receiving treatment for symptoms for exposures to fumes and chemicals which occurred while he was performing welding work for BNSF prior to the signing of the release in April 2003.  The District Court also noted that Sinclair had counsel when he signed the release, and that Sinclair indicated that he understood the release and what he was signing.  Furthermore, the District Court interpreted the release language to preclude any chemical claims, as well a work-related accident involving his ankle which occurred while employed as a truck driver, and any and all claims, known or unknown, that could be made.

¶16     After the District Court granted summary judgment to BNSF on the remaining counts of Sinclair's complaint, Sinclair sought to undertake further discovery on Count II, the bad faith claims.  Sinclair argued that these claims had previously been stayed pending the resolution of the underlying claims, and that since those underlying claims had been dismissed, he could now pursue his bad faith claims.  The District Court agreed and subsequently issued a scheduling order.

---

[2]  The role that § 5 of FELA plays in the context of settlement releases is discussed below at ¶¶ 48-52.

9

¶17 BNSF initially acquiesced in these further proceedings, but on August 16, 2007, BNSF moved the District Court to "reaffirm" its previous dismissal of Sinclair's bad faith claims. It asserted that the District Court had previously dismissed, not stayed, Sinclair's bad faith claims and urged the District Court to reaffirm its earlier dismissal. On October 26, 2007, Sinclair filed a motion to amend his bad faith and punitive damages claims. On November 1, 2007, the District Court held a hearing on BNSF's motion for reaffirmance of the previous dismissal of the bad faith claim, and on November 2, 2007, the District Court granted BNSF's motion. In its written order, the District Court acknowledged that it had previously dismissed these claims without prejudice, and that it erred in stating at the June 5 hearing that it had stayed them. The District Court then reaffirmed this dismissal as well the dismissal of all the other counts. The District Court further directed that if Sinclair should file a new complaint containing the bad faith claim under a new cause number, the clerk of court would not assess a new filing fee to Sinclair.

¶18 On November 19, 2007, Sinclair filed a new complaint alleging bad faith against BNSF under a new cause number in the Eighth Judicial District Court. On December 20, 2007, BNSF removed this state court action to the federal district court in the District of Montana, Great Falls Division, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. As of the time of this appeal, Sinclair's action in federal district court is still pending.

¶19 Sinclair now timely appeals the District Court's dismissal of his claims against BNSF. He presents several issues on appeal. First, he challenges the dismissal of his state law claims against BNSF. Second, he challenges the dismissal of his alternative FELA claim. Third, he alleges that the District Court abused its discretion in denying his

10

October 26, 2007 motion to amend his bad faith claim. Finally, he maintains that the District Court erred in dismissing Count I of his complaint with respect to the allegations of manganese poisoning.

¶20 As an initial matter, and as noted above, Sinclair's bad faith claims have been removed to federal court. Once those claims were removed, the District Court was divested of jurisdiction over them. "A basic removal principle is that once the provisions of Section 1446(d), Title 28, U.S. Code have been met, the state court is divested of jurisdiction to proceed further until there has been a remand by the federal court." *Borkowski v. Abood*, 884 N.E.2d 7, 10 (Ohio 2008) (citing *Yarnevic v. Brink's, Inc.*, 102 F.3d 753, 754 (4th Cir. 1996); *Maseda v. Honda Motor Co., Ltd*, 861 F.2d 1248, 1254 (11th Cir. 1988)). This being so, a state appellate court may not issue further rulings on the lower court's decisions. *See Lewis v. C.J. Langenfelder & Son, Jr., Inc.*, 587 S.E.2d 697, 700-01 (Va. 2003). Moreover, once a case has been removed to federal court "[t]he question of the removability of a suit from a state court to a Federal court is a matter exclusively and necessarily for cognizance by the Federal court." *State ex. rel. Coleman v. Dist. Ct. of Fifth Jud. Dist. In and For Beaverhead Co.*, 120 Mont. 372, 376, 186 P.2d 91, 93 (1947).

¶21 While we realize that Sinclair is appealing from the District Court's decision to dismiss his original bad faith complaint—thus forcing him to file a new complaint which was then removed by BNSF to federal court—we are nonetheless now faced with the fact that the federal court has exercised jurisdiction over the bad faith claim. Any decision we were to make regarding the District Court's disposition of this claim would not strip the

11

federal court of jurisdiction over the present action, which was properly removed. Therefore, until and unless Sinclair's bad faith claims are returned to the state District Court, we decline under the foregoing authorities to further address them in this appeal.

¶22 Thus, we state the remaining issues on appeal as follows:

¶23 **Issue One:** *Did the District Court err in dismissing Sinclair's state law claims for fraud and related claims for punitive damages?*

¶24 **Issue Two:** *Did the District Court err in granting summary judgment to BNSF on Sinclair's remaining FELA claims?*

## STANDARD OF REVIEW

¶25 We review a district court's ruling on a motion to dismiss under the standards set forth in M. R. Civ. P. 12(b)(6). A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief. *Reidelbach v. Burlington Northern and Santa Fe Ry. Co.*, 2002 MT 289, ¶ 14, 312 Mont. 498, ¶ 14, 60 P.3d 418, ¶ 14. When considering a motion to dismiss under M. R. Civ. P. 12(b)(6), all well-pleaded allegations and facts in the complaint are admitted and taken as true, and the complaint is construed in a light most favorable to the plaintiff. *Reidelbach*, ¶ 14. A district court's determination that a complaint has failed to state a claim for which relief can be granted is a conclusion of law which we review for correctness. *Reidelbach*, ¶ 14.

¶26 We review de novo a district court's decision to grant summary judgment using the criteria set forth in M. R. Civ. P. 56. *Stockman Bank of Mont. v. Mon-Kota Inc.*, 2008 MT 74, ¶ 11, 342 Mont. 115, ¶ 11, 180 P.3d 1125, ¶ 11. The party moving for summary

judgment must demonstrate the absence of genuine issues of material fact, and entitlement to judgment as a matter of law. *Stockman*, ¶ 11. Where a district court determines that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law, we review the district court's conclusions of law for correctness. *Lohmeier v. State*, 2008 MT 307, ¶ 12, 346 Mont. 23, ¶ 12, 192 P.3d 1137, ¶ 12.

## DISCUSSION

¶27 **Issue One:** *Did the District Court err in dismissing Sinclair's state law claims for fraud and related claims for punitive damages?*

¶28 The District Court dismissed Sinclair's fraud claims on the theory that federal law governed those claims by virtue of FELA, and that federal law did not permit him to simultaneously affirm the validity of his release and independently pursue state law claims related to fraud. Under *Dice* and *Counts v. Burlington Northern R.R. Co.*, 896 F.2d 424 (9th Cir. 1990), the District Court concluded that Sinclair was limited to any remedies available to him under FELA, which permits a cause of action to set aside a release on the basis of fraud in the inducement. Thus, the District Court concluded Sinclair could state a cause of action to challenge the release on the basis of fraud under federal law standards, but could not bring a fraud-related claim under state law, and granted BSNF's motion to dismiss this claim.

¶29 Sinclair maintains the District Court erred in dismissing his state law claims for fraud, asserting that the District Court misunderstood the nature of his claims. Sinclair argues that he was not attempting to rescind his release, a claim which would have been

13

indeed covered by federal law under FELA. Instead, he was affirming the validity of the settlement and then bringing a separate cause of action under state law for fraud, seeking damages caused by BNSF's fraud and deceit in concealing evidence related to the FL-80 truck and misrepresenting that evidence to the jury. Such damages included the tens of thousands of dollars wasted on his trial, as well as punitive damages for BNSF's alleged fraudulent practices as permitted under state law. Sinclair argues that federal law under FELA does not preempt this type of state law claim and that *Riedelbach* controls the preemption issue and supports his position.

¶30 In *Riedelbach*, we discussed the history and congressional intent behind passage of FELA. *See Riedelbach*, ¶¶ 18-19. We stated that "[c]ourts since 1908 have broadly interpreted the FELA in an effort to honor the Congressional intent of the Act, which was to protect railroad workers and to provide assured compensation for those workers injured by the negligence of their railroad employer. The question we must answer in the case at bar is just how broadly the FELA is to be interpreted, and whether and when it will preempt state tort claims." *Riedelbach*, ¶ 20. In that case, we concluded FELA did not prevent an injured railroad worker from bringing state law claims for bad faith claims handling practices because they were not federally preempted by FELA, and because the litigation of those claims would not "conflict with or stand as an obstacle to the accomplishment and execution of FELA." *Riedelbach*, ¶ 54. In like manner, the issue before us in the instant case turns squarely upon whether Sinclair's state law claims are preempted by federal law under FELA.

¶31     In *Counts*, the Ninth Circuit addressed a claim very similar to the one before us now. In that case, BNSF employee Silas Counts (Counts) injured his back and left leg while at work. *Counts*, 896 F.2d at 425. BNSF conceded its responsibility for the injury and began making small payments to Counts, but later threatened to stop those payments if Counts hired an attorney to investigate his claim. A BNSF claims representative told Counts to attend a FELA trial involving another BNSF employee, which resulted in a verdict for BNSF. After this, BNSF told Counts that he too would lose if he chose to go to trial with his claims. BNSF also told Counts that he was not seriously injured (even though BNSF's own reports showed otherwise), and told him that BNSF's claims office in his area was closing soon and that after it closed BNSF would make Counts no more offers and no more advances if he did not immediately accept its offer.

¶32     Counts accepted the offer but then later brought a diversity action against BNSF seeking state law fraud damages in inducing him to sign the release. The federal district court rejected Counts' claim, concluding it was "preempted by federal law because a cause of action under FELA existed for fraud in the inducement of a release." *Counts*, 896 F.2d at 425. Counts appealed to the Ninth Circuit, which affirmed. *Counts*, 896 F.2d at 426. As stated by the Ninth Circuit,

> Notwithstanding a document signed by an employee which purports to release his employer for FELA injury claims, the employee may bring a FELA suit for damages by challenging the validity of the release for fraud. *See Dice v. Akron, Canton & Youngstown R.R. Co.,* 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398 (1952). A challenge to the validity of a FELA release for fraud raises a federal question to be determined under federal rather than state law. *Id.* at 361, 72 S.Ct. at 314. To permit independent state-law actions for fraud in inducing FELA releases would lead to results that would vary from state to state. That we cannot allow. "[O]nly if federal

15

law controls can the federal Act be given that uniform application throughout the country essential to effectuate its purposes." *Id.*

*Counts*, 896 F.2d at 425 (footnote omitted, alterations in original).

¶33 Because Counts had a cause of action to set aside the release for fraud under FELA, the court held that he could not bring an independent state law claim for fraud. "Counts has a cause of action under FELA available to him. Thus, Counts may not bring an independent state law claim for fraud in the inducement of a release." *Counts*, 896 F.2d at 426 (citing *Lancaster v. Norfolk & Western Ry. Co.*, 773 F.2d 807, 812 (7th Cir. 1985)). Here, Sinclair seeks to bring an independent cause of action for fraud under state law while simultaneously affirming the validity of the FELA release. However, he has failed to cite any FELA cases in which such an action has been permitted, and the holding in *Counts* clearly precludes such an a claim.

¶34 Furthermore, we agree with the District Court that *Reidelbach* does not support Sinclair's argument. As the District Court recognized here, the claimant in *Reidelbach* had not entered into a release with BNSF at the time he brought his bad faith claims handling practices. The lack of a release in that case was a key factor in our conclusion that his state law claims were not federally preempted. BNSF had argued that Riedelbach was without any remedy because FELA controlled all the negotiation and settlement procedures but did not itself provide a remedy for a suit claiming that such procedures were conducted in bad faith. *Reidelbach*, ¶ 43. Thus, the claimant was without any legal recourse under federal law and his claims fell into the category of *damnum absque injuria*

16

(i.e., a loss which does not give rise to an action for damages). We responded to this argument as follows,

> Certainly we recognize that *damnum absque injuria* claims exist, but Reidelbach's grievances do not fall into this category. *Dice* and its offspring, including *Counts* . . . are distinguishable from the case at bar in one important detail—Reidelbach did not enter into a release agreement with BNSF. This is a critical distinction because an executed release actually defines and potentially compromises the amount of damages an injured employee receives for his or her physical injury; it establishes negligent liability and assigns a monetary value to the work-related injury. It does exactly what a FELA court proceeding would do if the proceeding was held. It is for this reason that a release is linked inextricably to the FELA claim. We do not have that link in the case at bar.

*Reidelbach*, ¶ 44.

¶35 Here, by contrast, Sinclair executed a FELA release. The release in this case is "inextricably linked" to Sinclair's claims and, under FELA, Sinclair may challenge the validity of that release and have it set aside if there was fraud in the inducement as defined under federal law. Thus, as in *Counts*, Sinclair has an available FELA claim which he may pursue. However, while Sinclair may challenge the validity of the release under federal law, FELA does not permit Sinclair to affirm that release, and then separately sue for state law damages, and Sinclair has failed to provide any authority showing that he may do so. Accordingly, we hold that the District Court did not err in dismissing Sinclair's state law fraud claims on the grounds that they were preempted by FELA. Similarly, we hold that Sinclair's related punitive damages claims were properly dismissed as well.

¶36 **Issue Two:** *Did the District Court err in granting summary judgment to BNSF on Sinclair's remaining FELA claims?*

17

¶37     At the June 5 hearing, the District Court granted summary judgment to BNSF on Sinclair's FELA claims, holding that the release itself was valid and that its scope did not violate § 5 of FELA, and thus prevented Sinclair from litigating further FELA claims. Under FELA, a release may be valid in the sense that it was not fraudulently induced; however, its scope may be limited by virtue of operation of § 5 of FELA.  This statutory provision reads in pertinent part as follows:

> Any contract, rule, regulation or device whatsoever, the purpose or intent of which shall be to enable the common carrier to exempt itself from any liability created by this Chapter, shall to that extent be void . . . .

45 U.S.C. § 55.

¶38     Federal courts, including the United States Supreme Court, have liberally construed § 5 of FELA in favor of the rights of railroad employees.  *See Wicker v. Consolidated Rail Corp.*, 142 F.3d 690, 701 (3rd Cir. 1998).  Because of the unique role § 5 plays in the context of FELA releases, we deem it necessary to consider both the overall validity of the release, and, second, whether its scope precludes Sinclair from pursuing the manganese poisoning claims set forth in Count I of his complaint.

**A.     The Validity of the Release With Respect to the Alternative FELA Claim and Count V**

¶39     The District Court concluded that the FELA release executed by Sinclair barred his alternative FELA claims as well as his additional claims stated in Count V.  Sinclair argues that the District Court erred in granting summary judgment to BNSF and concluding that the release barred his alternative FELA claim.  He argues that he added this claim after BNSF filed its initial motion to dismiss.  In the event his state law claims

18

were dismissed, he had argued that he should be allowed to pursue this alternative FELA claim and seek a remedy for BNSF's fraudulent conduct.

¶40 Sinclair's alternative claim under FELA alleged that BNSF had assigned him to work in unsafe working conditions with unsafe equipment, including but not limited to the FL-80 truck. See ¶ 10. Sinclair further alleged that BNSF's overall negligence caused his spinal and related general damages. Clearly, the allegations of Sinclair's alternative claim are precisely in the nature of the claims released (see ¶ 3); yet, Sinclair does not seek in either his alternative FELA claim or Count V to set aside this release. For the reasons noted above, we conclude he cannot both affirm the release and seek damages anew for injuries stemming from the same conduct already released. We therefore affirm the District Court on this issue.

**B.     Scope of the Release and Sinclair's Manganese Poisoning Claims**

¶41 In addition to determining that the release barred his alternative FELA claims, the District Court concluded that there were no genuine issues of material fact that the scope of the release covered Sinclair's manganese poisoning claims, and that it did not conflict with § 5 of FELA. According to the District Court, Sinclair knew of his symptoms at the time he signed the release, understood they were work-related, and also understood that the release covered those claims. Thus, the District Court granted BNSF summary judgment as a matter of law, concluding that the release precluded Sinclair from pursuing the manganese poisoning claims in Count I of his complaint.

¶42 Sinclair argues that the District Court erred. He maintains that the District Court's ruling runs afoul of § 5 of FELA. *See* ¶ 37. Sinclair argues that language in the release

(*see* ¶ 3) releasing all "unknown" claims, including an undiagnosed injury due to toxic fume exposures, violates § 5 of FELA, and that any release with respect to his manganese poisoning claims should be declared void. In support of his argument, Sinclair cites several cases including *Babbit v. Norfolk & Western Ry. Co.*, 104 F.3d 89 (6th Cir. 1997) and *Wicker*, in which courts have invalidated a release based on its conflict with § 5 of FELA. Citing to *Bevacqua v. Union Pacific R.R. Co.*, 1998 MT 120, ¶ 49, 289 Mont. 36, ¶ 49, 960 P.2d 273, ¶ 49, Sinclair asserts that the release should be liberally construed in his favor and allow his manganese poisoning claims to go forward.

¶43 Sinclair specifically argues that *Babbit* and *Wicker* cast doubt on the validity of boilerplate releases such as the one used in this case. First, quoting *Babbit*, Sinclair argues that "[t]o be valid, a release must reflect a bargained-for settlement of a known claim for a specific injury, as contrasted with an attempt to extinguish potential future claims the employee might have arising from injuries known or unknown by him." *Babbit*, 104 F.3d at 93. Here, Sinclair argues that he never bargained for the release of the specific claims of manganese poisoning. Second, citing to *Wicker*, Sinclair argues that the fact that he was represented by counsel is irrelevant to the question of whether the release was valid. Finally, citing to both *Babbit* and *Wicker*, Sinclair maintains that the fact that he had some symptoms which might have been associated with his toxic exposure prior to executing the release does not mean that a general release would be valid with respect to those claims.

¶44 Additionally, Sinclair maintains that three experienced members of BNSF's claims department, including Jacobson, admitted under oath that they could not settle claims for

undiagnosed injuries. Sinclair maintains that throughout the negotiation of the release, it was understood that this principle governed the settlement discussions. Sinclair argues that this evidence should have been sufficient to trigger a conclusion that there was a genuine issue of material fact precluding summary judgment. Accordingly, Sinclair seeks the reversal of the District Court's grant of summary judgment and the reinstatement of his manganese poisoning claims.

¶45 BNSF responds that the terms of the release are not ambiguous, and that the general release should apply to Sinclair's manganese claims. BNSF asserts that Sinclair's own testimony establishes his awareness of the accrual of his manganese poisoning claims prior to signing the release. BNSF points to portions of his deposition testimony where he acknowledged that smoke from the welding fumes made him sick as early as 2001, and that he had symptoms such as mood swings, irritability, headaches, nosebleeds, and respiratory problems and shaking at that time. Further, BNSF points out that Sinclair had reason to suspect that these symptoms were due to the welding fumes based on some personal research he conducted. BNSF maintains that this knowledge triggered the accrual of his FELA cause of action, and that under federal law Sinclair had an affirmative duty to investigate his claims once he experienced and became aware of these symptoms.

¶46 BNSF further maintains that the District Court applied the correct legal standard in concluding that the scope of the release as it pertained to Sinclair's manganese poisoning claims did not run afoul of § 5 of FELA. In this regard, BNSF argues that its position in supported by *Wicker* as well as *Brophy v. Cincinnati, New Orleans, & Texas Pacific Ry.*

*Co.*, 855 F. Supp. 213 (S.D. Ohio 1994), and *Manis v. CSX Transp., Inc.*, 806 F. Supp. 177 (N.D. Ohio 1992). Particularly, BNSF argues that under *Brophy* a release will be invalid under § 5, only if the employee is unaware of the injury at the time of the signing of the release and the employee's unawareness is reasonable. *See Brophy*, 855 F. Supp. at 217. Similarly, BNSF maintains that under *Manis* a release will be valid with respect to injuries which had already occurred and of which the employee was aware when he signed the release. *See Manis*, 806 F. Supp. at 179. Because Sinclair was aware of his symptoms prior to executing the release, and knew they were related to his welding work, he released this "known risk" when he signed the release, and it does not violate § 5 of FELA to enforce the release with respect to his manganese poisoning claims.

¶47 The District Court granted summary judgment to BNSF finding that there were no genuine issues of material fact as to the scope of the release in this case. Under de novo review, our task is to determine if this conclusion was correct as a matter of law. *Stockman*, ¶ 11; *Lohmeier*, ¶ 12. Although the District Court did not issue a written order, the transcript reveals that its decision was based on three major findings: (1) that Sinclair knew at the time he signed the release that he was experiencing symptoms related to welding that could be attributable to fumes and chemicals from his workplace; (2) that Sinclair was represented by counsel at the time and reviewed the release with him; and (3) that the release clearly set forth a release of the chemical claim, and indicated—in addition to the ankle accident and injury related to the FL-80 truck—a release of "any and all claims that could be made including exposure to chemical fumes." The District Court apparently concluded that a FELA release will cover those injuries of

22

which a reasonable person would be aware at the time he entered into the release, and which he or she would attribute to work. The District Court placed weight upon all three factors noted above in concluding that the release entitled BNSF to summary judgment as a matter of law on Sinclair's manganese poisoning claims.

¶48 Our inquiry is two-fold: Did the District court err in concluding that the "boilerplate" release signed by Sinclair did not violate § 5 of FELA, and did the District Court err in concluding that there were no genuine issues of fact precluding summary judgment? To answer these questions, we turn to *Wicker*.

¶49 In *Wicker*, a case relied upon by both BNSF and Sinclair, the Third Circuit set forth a standard under which the validity of a FELA release should be evaluated in light of § 5 of that Act. In that case, five plaintiffs (collectively employees), were employees of Conrail who had suffered work-related injuries. All the employees had executed releases which appeared to settle all claims for past and future injuries. *Wicker*, 142 F.3d at 692-94. Each employee developed additional chemical-related symptoms after signing their releases which they believed were attributable to work-related conditions. The employees each claimed that their additional symptoms were not covered by their previous releases. For some of the employees, the new symptoms developed after the releases were signed, while others were aware of some of the symptoms before signing the releases but did not attribute them to work conditions.

¶50 The fundamental question for the Third Circuit in *Wicker* concerned the scope of § 5's application and whether it precluded the enforcement of the releases against the newly-filed claims. The court began its analysis by conducting a brief yet thorough

23

review of the United State Supreme Court's jurisprudence in this area. *See Wicker*, 142 F.3d at 696-97. The court concluded that releases were not per se unreasonably invalid under FELA, and "that parties may settle '[w]here controversies exist as to whether there is liability, and if so for how much.' " *Wicker*, 142 F.3d at 697 (quoting *Callen v. Pennsylvania R.R. Co.*, 332 U.S. 625, 631, 68 S. Ct. 296, 298-99 (1948)). At the same time, the Third Circuit noted that in *Boyd v. Grand Trunk W.R. Co.*, 338 U.S. 263, 70 S. Ct. 26 (1949), the United State Supreme Court cautioned that in light of § 5's language, it was necessary to distinguish appropriate compromises from " 'a device which obstructs the right of the [FELA] plaintiff to secure the maximum recovery if he should elect judicial trial of his cause.' " *Wicker*, 142 F.3d at 697 (quoting *Boyd*, 338 U.S. at 266, 70 S. Ct. at 27-28). For this reason, the *Wicker* court noted that general, boilerplate releases were often viewed with suspicion and concluded that the proper reach and application of § 5 in this context remained "unclear," possibly because "the Court's decisions rejecting general releases as bars to subsequent claims have been fact-driven, and consequently do not provide a generally applicable rule of law." *Wicker*, 142 F.3d at 698.

¶51    From here, the court went on to examine some seminal cases in this area in order to determine the proper principles under which to evaluate the validity and scope of a FELA release in light of § 5. The court recognized that lower courts addressing the issue were split between those that ban the use of general releases in light of § 5, and those that allow them. *See Wicker*, 142 F.3d at 699 (collecting cases). The *Wicker* court took particular note of the Sixth Circuit's decision in *Babbit*. *Babbit* set forth a bright line rule

24

to the effect that releases are valid only if they are part of a bargained-for settlement of a specific injury, as opposed to " 'an attempt to extinguish potential future claims the employee might have arising from the injuries known or unknown by him.' " *Wicker*, 142 F.3d at 699 (quoting *Babbit*, 104 F.3d at 93). In light of the United States Supreme Court's expression in *Callen* that settlements apparently have some role to play under FELA, the *Wicker* court rejected the *Babbit* standard as overbroad, in part out of a concern that such a rigid, bright-line rule, would severely hamstring the ability of employers and employees to engage in the settlement process. As stated by the court,

> The question still remains whether a rule allowing parties to release claims related to known risks rather than known injuries reflects FELA's remedial goals. We believe it does. We hold that a release does not violate § 5 provided it is executed for valid consideration as part of a settlement, and the scope of the release is limited to those risks which are known to the parties at the time the release is signed. Claims relating to unknown risks do not constitute "controversies," and may not be waived under § 5 of FELA. *See Callen*, 332 U.S. at 631, 68 S.Ct. at 298-99. For this reason, a release that spells out the quantity, location and duration of potential risks to which the employee has been exposed—for example toxic exposure—allowing the employee to make a reasoned decision whether to release the employer from liability for future injuries of specifically known risks does not violate § 5 of FELA.

*Wicker*, 142 F.3d at 701.

¶52    The court went on to explain that a release which "chronicles the scope and duration of known risks . . . would supply strong evidence in support of the release defense," but also cautioned that boilerplate releases should be viewed with caution, and that trial courts should recognize that the validity of a release is a "fact-intensive process." *Wicker*, 142 F.3d at 701.

25

> Instead, we conclude that a release may be strong, but not conclusive, evidence of the parties' intent. Where a specific known risk or malady is not mentioned in the release, it would seem difficult for the employer to show it was known to the employee and that he or she intended to release liability for it. Furthermore, where a release merely details a laundry list of diseases or hazards, the employee may attack that release as boiler plate, not reflecting his or her intent. We recognize that this is a different (and more difficult) standard for railroad employers than is typical in non-FELA situations, but given the Supreme Court's pro-employee construction of the FELA, *see Kernan v. American Dredging Co.*, 355 U.S. 426, 432, 78 S.Ct. 394, 398, 2 L.Ed.2d 382 (1958) ("it is clear that the general congressional intent was to provide liberal recovery for injured workers"); *Boyd*, 338 U.S. at 265, 70 S.Ct. at 27 ("Congress wanted Section 5 to have the full effect that its comprehensive phraseology implies.") (internal quotation omitted), we adopt it.

*Wicker*, 142 F.3d at 701.

¶53   The *Wicker* approach to the scope and validity of FELA releases in light of § 5 of FELA has been adopted approvingly by several courts. *See Jaqua v. Canadian Nat. R.R., Inc.*, 734 N.W.2d 228, 229 (Mich. App. 2007) (adopting the *Wicker* approach because "[t]he rationale in *Wicker* allows the employer and the employee the freedom to negotiate and settle claims, but protects the employee from releasing the employer for unknown liability that was not considered and resolved in an informed manner."); *Ill. Cent. R.R. Co. v. McDaniel*, 951 So.2d 523, 531-32 (Miss. 2006); *Oliverio v. Consolidated Rail Corp.*, 822 N.Y.S.2d 699, 702 (N.Y. Sup. 2006); *Sea-Land Serv., Inc. v. Sellan*, 231 F.3d 848, 852 (11th Cir. 2000). We join these courts in adopting the standard set forth in *Wicker* to determine the validity and scope of a FELA release in light of § 5 of that act.

¶54   Applying *Wicker* in the instant case, we conclude that the District Court erred in granting summary judgment to BNSF on Sinclair's manganese poisoning claims. While Sinclair might have arguably known of the risk of injury from toxic exposure to

manganese, it is another thing to say that there is no genuine issue of material fact as to whether he and BNSF intended to release this claim when they entered into the release. Under *Wicker*, the language of the release in this case is not sufficient to show an absence of a genuine issue of material fact because it makes only a general mention of chemical exposure, and does not spell out the "quantity, location and duration" of the manganese exposure. *Wicker*, 142 F.3d at 701. For that matter, the release does not even specifically mention exposure to manganese poisoning at all. Additionally, it contains precisely the type of boilerplate terms—that is, a release of "claims for injuries, illnesses or damages . . . which are unknown to me at the present time" (*see* ¶ 3)—which are suspect given the language of § 5 and FELA's remedial purposes, and its "pro-employee" construction by the United States Supreme Court. *See Wicker*, 142 F.3d at 701. Thus, the language of the release should be viewed with caution, in spite of the fact that Sinclair himself may have suspected he had been poisoned by manganese exposure. Moreover, Sinclair and his attorney both stated that they did not believe that the release covered anything other than the back and ankle injuries, and there appears to be some evidence from BNSF's own representatives that they themselves did not believe the manganese poisoning claims were covered by the release in this case.

¶55 Because there are genuine issues of material fact as to the parties' intent in entering into the release and whether it covered Sinclair's manganese poisoning claims, we reverse the District Court's grant of summary judgment on Sinclair's manganese poisoning claims. The intent of the parties to the release in this regard should be determined by a trier of fact.

**CONCLUSION**

¶56  We affirm the District Court's dismissal of Sinclair's claims, save for those claims in Count I relating to manganese poisoning.  While expressing no view on the merits of these claims, we hold that the intent of the parties as to whether the release was intended to cover these claims should be decided by a trier of fact, and therefore remand this issue for further proceedings consistent with this Opinion.

/S/ PATRICIA COTTER

We concur:

/S/ JAMES C. NELSON
/S/ JIM RICE
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS