CHAMBERLIN, JUSTICE, FOR THE COURT:
 

 ¶1. Andrew L. Ward sued Illinois Central Railroad Company on behalf of Larry Seward. Ward alleged that Illinois Central breached its duty of care and failed to provide Seward with a safe place to work, allegedly causing Seward's brain cancer. Illinois Central filed a motion for summary judgment based on a previous settlement and release that Seward had entered into with Illinois Central before his death. The trial court granted Illinois Central's motion for summary judgment. Ward appealed the trial court's grant of summary judgment. The Court affirms.
 

 STATEMENT OF FACTS
 

 ¶2. Larry Seward worked for Illinois Central Railroad Company from 1961 to 2004. In 2005, Seward settled an asbestosis claim with Illinois Central. He subsequently developed and passed away from anaplastic oligodendroglioma, a type of brain cancer.
 

 ¶3. In 2012, Andrew L. Ward sued Illinois Central on behalf of Seward. Ward alleged that Illinois Central breached its duty of care and failed to provide Seward with a safe place to work. The complaint detailed specific issues with the work environment, including Seward's exposure to chemicals and hazardous conditions. The complaint alleged that the working environment
 "caused, in whole or in part," Seward's brain cancer.
 

 ¶4. Illinois Central filed a motion for summary judgment based on the settlement and release that Seward signed in 2005. The 2005 settlement was due to an asbestos-related illness. In pertinent part, the release provided,
 

 [T]he Undersigned alleges [that Releasees (Illinois Central) ] created an exposure or exposures to asbestos, coal, coal dust, welding fumes, brass fumes, diesel fumes, dust, paint vapors, fuel fumes, methyl bromide, ammonia gas, sand, silica, Dow Clean, solvents, cleaners, degreasers, and other fumes, dusts, mists, gases, and vapors from any material, chemical, toxin or other agent. The Undersigned asserts that such exposure caused a condition, injury, disease and/or deficiency (hereinafter, referred to as "condition") in the Undersigned including, but not limited to plaques, calcifications, thickening, pneumoconiosis including asbestosis and silicosis, severe and permanent injuries to the lungs, respiratory system, nerves and/or nervous system, cancer, and any and all other conditions, diseases or injuries existing prior to the date of this Release Agreement which are known to the Undersigned or reasonably could have been known prior to the date of this Release Agreement and which may further develop in the future as a result of what now exists, arising from or as a result of the alleged exposures or which may further develop as a result of the Undersigned's current known or unknown conditions, which allegedly developed over time while working in one or more of the Releasees employ, which are expressly released herein.
 

 In the process of making the settlement, Illinois Central asked Seward to fill out its "Pulmonary Questionnaire." The pulmonary questionnaire asked Seward to "[p]lease check all chemicals you allege exposures from while employed at Illinois Central." Seward placed an "x" or a check mark next to asbestos, diesel exhaust, silica, solvents, degreasers, coal, chemicals and weed spray. He also checked that he had been diagnosed with asbestosis, bronchitis and pneumonia.
 

 ¶5. Ward presented the testimony of Robert Peirce Jr. Peirce was Seward's attorney at the time of the 2005 settlement and release. Peirce's affidavit stated that "Mr. Seward and myself were unaware that Mr. Seward has suffered exposures to chemical which would ultimately cause him to contract primary brain cancer ...." Peirce further provided that he "did not negotiate or obtain any monies from Illinois Central Railroad Company to compensate Mr. Seward for anything other than his lung injury" and if he "[h]ad known that Mr. Seward would subsequently develop anaplastic oligodemdroglioma or any other occupational cancer not listed in the Complaint or Release [he] would have demanded additional compensation for Mr. Seward." Peirce also provided the following deposition testimony:
 

 Q. You agree with me that these questionnaires ask about exposure beyond asbestos to each of these individuals; correct?
 

 A. No, I don't agree with that.
 

 Q. What do you think the purpose of question 3A is?
 

 A. It says check all the chemicals you allege exposure from while employed at Illinois Central.
 

 Q. So do you think they're looking for exposures beyond just asbestos in answer to that question?
 

 A. No.
 

 Q. What do you think they're looking for?
 

 A. I think they're looking for asbestos exposure.
 

 ....
 

 Q. Is it your position the railroad didn't want to know that they were exposed to diesel exhaust, they just wanted to know if they were exposed to asbestos?
 

 A. No. But I believe exposure to diesel exhaust could be a contributing force in asbestosis.
 

 Q. How is that?
 

 A. Well, I think that some people believe that exposure to diesel exhaust can cause asbestosis or asbestosis-related diseases. So that's probably why it was included in there.
 

 ¶6. The trial court granted Illinois Central's motion for summary judgment.
 
 [1]
 
 The trial court concluded that "[t]he Plaintiff has failed to provide any evidence that would create a question of fact as to whether Mr. Seward did not contemplate (or otherwise have the opportunity to contemplate) the risks of his exposure to the above-listed toxins when he settled his prior claims." Ward appealed the trial court's grant of summary judgment.
 

 STATEMENT OF THE ISSUE
 

 ¶7. Although the parties style the issue slightly differently, both parties agree that the only issue on appeal is whether summary judgment was properly granted.
 

 STANDARD OF REVIEW
 

 ¶8. The Court applies de novo review to the grant or denial of summary judgment.
 
 Ill. Cent. R.R. Co. v. Jackson
 
 ,
 
 179 So.3d 1037
 
 , 1044 (Miss. 2015) (citing
 
 Serv. Cos., Inc. v. Estate of Vaughn
 
 ,
 
 169 So.3d 875
 
 , 878 (Miss. 2015) ). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c). "A fact is material if it tends to resolve any of the issues properly raised by the parties."
 
 Holland v. Peoples Bank & Tr. Co.
 
 ,
 
 3 So.3d 94
 
 , 99 (Miss. 2008) (internal quotation marks omitted) (quoting
 
 Simpson v. Boyd
 
 ,
 
 880 So.2d 1047
 
 , 1050 (Miss. 2004) ). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.
 
 Jackson
 
 ,
 
 179 So.3d at
 
 1044 (citing
 
 Hosemann v. Harris
 
 ,
 
 163 So.3d 263
 
 , 267 (Miss. 2015) ). Further, the Court has provided,
 

 "A motion for summary judgment should be overruled unless the trial court finds, beyond a reasonable doubt, that the plaintiff would be unable to prove any facts to support his claim." The lower court is prohibited from trying the issues; "it may only determine whether there are issues to be tried." The non-moving party ... has the burden of providing " 'supportive evidence of significant and probative value' in opposition to the motion for summary judgment."
 

 Palmer v. Anderson Infirmary Benevolent Ass'n
 
 ,
 
 656 So.2d 790
 
 , 795-96 (Miss. 1995) (emphasis removed) (citations omitted).
 

 ANALYSIS
 

 Whether the trial court erred in granting Illinois Central Railroad Company's motion for summary judgment.
 

 ¶9. This case is governed by the Federal Employers' Liability Act (FELA). "FELA was designed 'to enable injured railroad workers to overcome a number of traditional
 defenses to tort liability that had previously operated to bar their actions.' "
 
 Wicker v. Consol. Rail Corp.
 
 ,
 
 142 F.3d 690
 
 , 696 (3d Cir. 1998) (quoting
 
 Lewy v. S. Pac. Transp. Co.
 
 ,
 
 799 F.2d 1281
 
 , 1287 (9th Cir. 1986) ). In pertinent part, FELA provides, "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void ...."
 
 45 U.S.C.A. § 55
 
 (West 2007).
 
 [2]
 

 ¶10. Courts around the country have adopted different approaches to interpreting Section 5 of the FELA. In
 
 Wicker
 
 , the United States Court of Appeals for the Third Circuit stated that "[t]o the extent that a release chronicles the scope and duration of the known risks, it would supply strong evidence in support of the release defense."
 
 Wicker
 
 ,
 
 142 F.3d at 701
 
 . In
 
 Illinois Central Railroad Co. v. Acuff
 
 , the Court adopted
 
 Wicker
 
 's "known risk" test.
 
 [3]
 

 Ill. Cent. R.R. Co. v. Acuff
 
 ,
 
 950 So.2d 947
 
 , 960 (Miss. 2006) ("[U]nder the specific language of Section 5 of the FELA and United States Supreme Court precedent, we find the Third Circuit's approach allowing the release of future claims based on specific risks known to the parties to be appropriate.").
 

 ¶11. Ward argues that the trial court overlooked the existence of the affidavit and the deposition testimony of Peirce, Seward's attorney. Ward concludes that Peirce's testimony makes Seward's intent a fact-intensive inquiry. Further, Ward argues that the determination of whether the release was boilerplate is also a jury issue. On the other hand, Illinois Central compares this case to
 
 Acuff
 
 and argues that summary judgment was appropriate. Illinois Central points to the release and to the pulmonary questionnaire and states that they are "limited to specific known risks." Further, Illinois Central states that Peirce's testimony was "immaterial and insufficient to create a material issue of fact in light of the other undisputed evidence."
 

 ¶12. Here, under
 
 Acuff
 
 and
 
 Wicker
 
 , the inquiry is two-fold. The Court considers whether the release at issue is boilerplate and whether the risk of developing brain cancer was known and contemplated by Seward at the time he signed the release.
 

 ¶13. Notably,
 
 Wicker
 
 explained the importance of allowing parties the right to quantify and limit future liabilities. It stated that "the parties may want to settle controversies about potential liability and damages related to known risks even if there is no present manifestation of injury."
 
 Wicker
 
 ,
 
 142 F.3d at 700-01
 
 . Further, although
 
 Wicker
 
 supported the use of releases, it also qualified the power of the release, stating,
 

 But we are wary of making the validity of the release turn on the writing alone because of the ease in writing detailed boiler plate [sic] agreements; draft releases might well include an extensive catalog of every chemical and hazard
 known to railroad employment. For this reason, we think the written release should not be conclusive. We recognize that what is involved is a fact-intensive process, but trial courts are competent to make these kinds of determinations.
 

 Id.
 

 at 701
 
 . The release "may be strong, but not conclusive, evidence of the parties' intent."
 

 Id.
 

 Wicker
 
 defined specific situations requiring a fact-intensive inquiry: "[w]here a specific known risk or malady is not mentioned in the release, it would seem difficult for the employer to show it was known to the employee and that he or she intended to release liability for it[,]" and "where a release merely details a laundry list of diseases or hazards, the employee may attack that release as boiler plate [sic], not reflecting his or her intent."
 

 Id.
 

 To determine if the release was boilerplate, the
 
 Wicker
 
 Court looked to the language of the release. The
 
 Wicker
 
 Court differentiated between releases that "recite a series of generic hazards to which [the employee] might have been exposed" and releases that provide "specific risks the employees faced during the course of their employment."
 

 Id.
 

 ¶14. The
 
 Acuff
 
 Court faced facts similar to this case, including an affidavit from the attorney involved in the original lawsuit.
 
 Acuff
 
 ,
 
 950 So.2d at 958
 
 . However, in
 
 Acuff
 
 , Illinois Central filed a motion to enforce the settlement agreement, and the parties agreed to have the trial judge determine all issues of law and fact.
 

 Id.
 

 at 952
 
 . The trial judge treated the known-risk analysis as fact-intensive and sat as the finder of fact.
 

 Id.
 

 On appeal, the Court applied an abuse-of-discretion standard of review.
 
 [4]
 

 Id.
 

 Therefore, although we cite
 
 Acuff
 
 for its adoption of
 
 Wicker
 
 , it provides little guidance regarding whether a contested issue of material fact exists.
 

 ¶15. Because the caselaw in Mississippi is limited, the Court looks to other states and federal courts for guidance.
 
 Wicker
 
 has been applied supporting and rejecting the grant of summary judgment.
 

 ¶16. In
 
 Jaqua v. Canadian National Railroad, Inc.
 
 ,
 
 274 Mich.App. 540
 
 ,
 
 734 N.W.2d 228
 
 (2007), the Court of Appeals of Michigan noted the specificity within the release at issue and granted summary judgment.
 

 Id.
 

 at 237
 
 . The
 
 Jaqua
 
 Court stated, "Jaqua specifically settled claims regarding cancer as well as any other illnesses related to his asbestos exposure. The release addressed a specific instance of disputed liability and specific injuries that Jaqua suffered, or was at great risk of suffering in the future-asbestosis and lung cancer."
 

 Id.
 

 (footnote omitted).
 

 ¶17. Similarly, in
 
 Blackwell v. CSX Transportation, Inc.
 
 ,
 
 220 Md.App. 113
 
 ,
 
 102 A.3d 864
 
 (2014), the Court of Special Appeals of Maryland affirmed the grant of summary judgment.
 
 Id.
 
 at 873. It adopted
 
 Wicker
 
 and held that the first release contemplated the second suit.
 
 Id.
 
 Specifically, it held that the first release had released CSX Transport from "any new or additional repetitive stress or cumulative trauma injury either presently existing or that may arise in the future to the lower extremities or other body parts."
 
 Id.
 
 Blackwell's subsequent suit was due to "bilateral plantar fasciitis," an injury to his lower extremity ; therefore, the court concluded that the first release specifically contemplated the second suit.
 
 Id.
 

 ¶18. Courts have also looked to
 
 Wicker
 
 to conclude that the interpretation of releases is fact-intensive and to support denial
 of summary judgment.
 
 Wicker
 
 ,
 
 142 F.3d at 701
 
 . The Supreme Court of Virginia recently addressed the application of
 
 Wicker
 
 's known-risk test to a settlement and release.
 
 Cole v. Norfolk S. Ry. Co.
 
 ,
 
 294 Va. 92
 
 ,
 
 803 S.E.2d 346
 
 , 352 (2017). Similar to
 
 Acuff
 
 , the analysis was fact-intensive, and the trial judge sat as the finder of fact.
 

 Id.
 

 at 353
 
 .
 

 ¶19. Further, in
 
 Sinclair v. Burlington Northern and Santa Fe Railway Co.
 
 ,
 
 347 Mont. 395
 
 ,
 
 200 P.3d 46
 
 (2008), the Supreme Court of Montana applied
 
 Wicker
 
 and denied summary judgment. The
 
 Sinclair
 
 Court considered the lack of specificity within the release, stating that "the release does not even specifically mention exposure to manganese poisoning at all."
 
 Id.
 
 at 60. The court then denied summary judgment, concluding that "the language of the release in this case is not sufficient to show an absence of a genuine issue of material fact ...."
 
 Id.
 

 ¶20. The Court now turns to the specific language of this release which it states,
 

 The Undersigned asserts that such exposure caused a condition, injury, disease and/or deficiency (hereinafter, referred to as "condition") in the Undersigned including, but not limited to plaques, calcifications, thickening, pneumoconiosis including asbestosis and silicosis, severe and permanent injuries to the lungs, respiratory system, nerves and/or nervous system,
 
 cancer
 
 , and any and all other conditions, diseases or injuries existing prior to the date of this Release Agreement which are known to the Undersigned or reasonably could have been known prior to the date of this Release Agreement and which may further develop in the future as a result of what now exists ....
 

 (Emphasis added.) Turning to our summary-judgment standard, the question is whether "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c). Here, the parties disagree on whether Peirce's testimony creates a genuine issue of material fact.
 

 ¶21. The first question is whether the language is boilerplate. Although the release does not address the development of anaplastic oligodemdroglioma, it does clearly provide for the release of cancer. No dispute exists that anaplastic oligodemdroglioma is a type of cancer. Like in
 
 Blackwell
 
 , although the exact name of the illness was not listed on the release, the illness provided is still sufficiently specific.
 
 See
 

 Blackwell
 
 ,
 
 102 A.3d at
 
 873 ;
 
 see also
 

 Wicker
 
 ,
 
 142 F.3d at 701
 
 (upholding releases that provide "specific risks the employees faced during the course of their employment"). Peirce did not testify regarding whether the release's language was boilerplate. While the dissent maintains that Seward's release is not distinguishable from the releases in
 
 Wicker
 
 as far as an inclusive list of chemical exposures and diseases are concerned, Seward's release is more specific and limited than the
 
 Wicker
 
 releases. Diss. ¶30. The releases in
 
 Wicker
 
 released the railroad from injuries "known or unknown" and, in Wicker's release, "foreseen or unforeseen."
 
 Wicker
 
 ,
 
 142 F.3d at 693-94
 
 . Also, if they included any list of exposures at all, the exposures in the releases were phrased in generic, broad terms.
 

 Id.
 

 In contrast, Seward released Illinois Central from known and specific injuries and conditions as well as those "which may further develop in the future as a result of what now exists, arising from or as a result of the alleged exposures," which had been listed in the release in specific detail. Therefore, the Court holds that the
 release was sufficiently specific and that it was not boilerplate.
 

 ¶22. The second question is whether the risk of developing cancer was known and contemplated by Seward at the time he signed the release. While Seward may not specifically have known he would develop anaplastic oligodemdroglioma, as stated above, cancer was clearly and specifically listed on the release. Further, Ward's complaint provides that Seward was exposed to diesel exhaust and additional chemicals and alleges that they "caused, in whole or in part," Seward's brain cancer. The release lists exposure to diesel fumes and provides a list of additional chemicals. Also, Seward checked exposure to diesel exhaust and chemicals on the pulmonary questionnaire. The release and the pulmonary questionnaire illustrate that Seward was on notice of the risk of suffering from cancer due to the listed exposures, unlike in
 
 Sinclair
 
 , in which the release did not specifically mention exposure to manganese poisoning.
 
 Sinclair
 
 ,
 
 200 P.3d at 60
 
 . Finally, Seward signed the release after his employment with Illinois Central had ended. Therefore, this suit cannot be due to an exposure to chemical or diesel fumes to which Seward had not already been exposed in 2005.
 

 ¶23. Peirce's after-the-fact testimony fails to change the specific language of the release and fails to affect the additional information and intent evidence illustrated by the pulmonary questionnaire. Thus, we hold that Peirce's testimony fails to create a genuine issue of material fact. Seward was on notice of the risk of cancer, including brain cancer, at the time he signed the release.
 

 CONCLUSION
 

 ¶24. Accordingly, the judgment of the trial court is affirmed. Summary judgment was properly granted to Illinois Central.
 

 ¶25.
 
 AFFIRMED.
 

 COLEMAN, MAXWELL, BEAM, ISHEE AND GRIFFIS, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J. RANDOLPH, C.J., NOT PARTICIPATING.
 

 Although Illinois Central brought other motions, the grant of summary judgment is the only motion addressed by the parties on appeal.
 

 45 U.S.C.A. § 55
 
 is also referred to as Section 5 of the FELA.
 

 An employee negotiating a claim for an existing controversy materially differs from an employee agreeing to a voluntary end to his or her employment and not negotiating the settlement of an existing controversy.
 
 Ratliff v. Norfolk S. Ry. Co.
 
 ,
 
 224 W.Va. 13
 
 ,
 
 680 S.E.2d 28
 
 , 38 (2009) (citing
 
 Babbitt v. Norfolk & W. Ry. Co.
 
 ,
 
 104 F.3d 89
 
 (6th Cir. 1997) );
 
 see also
 

 Wicker
 
 ,
 
 142 F.3d at 700
 
 . For an employee agreeing to a voluntary end to his or her employment, the
 
 Babbitt
 
 Court employed a bright-line rule stating that a release is only valid when it reflects "a bargained-for settlement of a known claim for a specific injury ...."
 
 Babbitt
 
 ,
 
 104 F.3d at 93
 
 . Some courts have noted the material factual difference between the application of the
 
 Babbitt
 
 and
 
 Wicker
 
 tests.
 
 See
 

 Wicker
 
 ,
 
 142 F.3d at
 
 700 ;
 
 Ratliff
 
 ,
 
 680 S.E.2d at 38
 
 .
 

 Similarly, in
 
 Illinois Central Railroad Co. v. McDaniel
 
 ,
 
 951 So.2d 523
 
 , 525 (Miss. 2006), Illinois Central filed a motion to enforce the settlement agreement. The Court reviewed the trial court's findings under an abuse-of-discretion standard of review.
 

 Id.
 

 at 526
 
 .