FANNIN et al., Appellants,

v.

NORFOLK & WESTERN RAILWAY COMPANY, Appellee, et al.*

[Cite as *Fannin v. Norfolk & W. Ry. Co.* (1995), 106 Ohio App.3d 401.]

Court of Appeals of Ohio,
Ninth District, Summit County.

Nos. 17134, 17136.

Decided Sept. 20, 1995.

---

* Reporter's Note: A discretionary appeal to the Supreme Court of Ohio was not allowed in (1995), 75 Ohio St.3d 1411, 661 N.E.2d 759.

402

*Hartley & O'Brien, R. Dean Hartley* and *James C. Wright,* for appellants.

*Burns, White & Hickton* and *David A. Damico,* for appellee.

*Ness, Motley, Loadholt, Richardson & Poole* and *Joseph R. Rice,* for defendants.

---

BAIRD, Presiding Judge.

These cases were heard on appeal from a judgment rendered in the Summit County Court of Common Pleas granting summary judgment in favor of appellee, Norfolk & Western Railway Company ("N & W"). We reverse.

There are two separate, yet related, cases at issue. Originally, the cases included forty-seven plaintiffs and fourteen defendants. A total of seven plaintiffs and one defendant remain. Appellant Eddie Fannin ("Fannin") seeks damages against N & W for work-related injuries and asbestos exposure allegedly incurred while Fannin was employed by N & W. Six other former N & W employees, James Cool, Harold Gilpin, Harold Howell, Vernon Lechner, Milton Loch, and Sherman Morris (the "Cool group"), advance claims similar to Fannin's, including claims arising under Section 51 *et seq.,* Title 45, U.S.Code, the Federal Employers' Liability Act ("FELA").

Fannin worked for the Akron, Canton & Youngstown Railroad (the "AC & Y") beginning in 1972. The Cool group also is composed of former AC & Y employees, though the terms of their employment vary. The AC & Y was purchased by N & W in 1982. Fannin performed various repair and maintenance tasks for the railroad throughout his period of employment. In 1990, the AC & Y was sold to another railroad. Fannin and a number of his coworkers (including the Cool group) found that they would have to accept lower wages in order to retain their jobs under the new ownership. A number of them chose to file wage-loss claims against N & W under a 1962 agreement which guaranteed such workers three hundred sixty days' pay in the event of a sale. These claims were pursued by their union on their behalf. The claims were submitted for arbitration.

Prior to any decision regarding the validity of these wage-loss claims, N & W offered these workers a settlement/buy-out proposal. According to the deposition testimony of Marcellus Kirchner, an N & W executive, the proposal required

that, in exchange for certain monies (which varied depending on the individual worker), the workers would relinquish their rights to employment with the railroad, along with the wage-loss claims under the 1962 agreement, which were then being considered by the arbitration panel. The workers were allegedly given informational packets detailing this proposal; some, including Fannin, claim they never received such information. Kirchner stated that he was not certain who had received packets, while another N & W executive, Dan Rush, conceded the possibility that Fannin had never received such documents.

The N & W proposal, then, was allegedly originally represented as a resignation, buyout, and settlement offer. However, the actual release agreement which accompanied this offer was worded quite broadly, and read as follows:

"I, [worker's name], in consideration of the sum of [settlement amount], the receipt of which is hereby acknowledged, hereby resign and surrender any right to employment by [N & W], and hereby release and forever discharge the company from any claim (with the exception of vested pension rights), demand, action, or cause of action, of any kind whatsoever, known or unknown, which I have or could have on account of, or in any manner arising out of or connected with, my employment by the said company, or the termination thereof, including but not limited to any claim of right asserted under or arising out of any agreement, regulation, condition, or statute affording me employment protection, protecting me from employment or covering the conditions of my employment. I understand that in addition to the above amount I will receive payment for wages earned but not yet paid and for any vacation earned but not yet taken. I also understand that I will be eligible for coverage under the Norfolk Southern Corporation Separation Program Death Benefit subject to the terms and conditions set forth in that program.

"[Income withholding taxes were calculated and deducted from the settlement amount.]

"This resignation and release and the deductions authorized herein are fully understood by me. This document is executed voluntarily and solely for the consideration above expressed, without any other representation, promise, or agreement of any kind whatsoever having been made or offered to me by the company or any agent, employee, or representative of the said company."

The worker's signature, as well as the net amount received, the check number, date, and signatures of two witnesses appeared at the bottom of each release. In some of the release forms, including Fannin's, the last paragraph was printed in all capital letters. Rush conducted the signing of some such release forms, including Fannin's. Rush stated that he fully advised each signatory that the release governed *all* claims, present and future, known or unknown. Thus, according to Rush, while the workers may have believed prior to signing that the

only claim they were giving up was their wage-loss claim, when they arrived to execute the document and receive their check they were advised that the release included all claims, not just the wage-loss claims. Rush's statements were disputed by Fannin, who claims, and submits affidavits from seventeen others who also claim, that Rush simply slid a form across the table and told the worker to sign it, without explanation. None of the workers had the opportunity to examine the release prior to the date assigned for them to sign it and receive their checks.

While his wage-loss claims were still pending, and prior to signing any agreements, Fannin was diagnosed with multiple myeloma, a form of bone cancer. At that point, he had already left the railroad and obtained another job, but his severance agreement with N & W was not yet finalized. Fannin left N & W in mid–1990, and was diagnosed with cancer in December 1990, but did not sign a release or obtain his N & W severance buyout check until December 5, 1991.

At the time Fannin's release was signed, both Fannin and N & W knew Fannin had cancer. This court is of the opinion that Fannin's FELA claim based on cancer had, therefore, already accrued at the time he signed his release. The members of the Cool group, on the other hand, signed their releases between one and five years prior to diagnosis of their respective asbestos-related diseases. This distinction becomes significant in determining whether, and upon which grounds, the respective appellants are entitled to relief.

N & W moved the trial court for summary judgment, asserting that its release represented a valid waiver of all claims and that it was, therefore, not liable to any plaintiff. The trial court granted this motion, holding that the release was both unambiguous and valid. Both the Cool group and Fannin now appeal, asserting the same four assignments of error on appeal, each purporting to establish that summary judgment was improper. All four assignments of error assert the impropriety of dismissing the FELA claims (Count I of the original complaint); dismissal of the other three counts of the complaint is not assigned as error in this appeal. We will consider only the first assignment of error, since it is, in our opinion, dispositive:

"When the evidence established, or at the very least showed a genuine issue of material fact, that N & W's separation or buy-out program is nothing more than an attempt to contract away or otherwise limit its full scope of liability under the Federal Employers' Liability Act [FELA], 45 U.S.C. § 51 *et seq.*, the trial court was in error in granting summary judgment on the basis that the separation program was not in violation of 45 U.S.C. § 55."

■ We shall first address the issue of whether summary judgment was properly granted with respect to determining if the releases signed by the

members of the Cool group were valid waivers of potential claims under FELA. In reviewing a trial court's entry of summary judgment, an appellate court applies the same standard used by the trial court. *Parenti v. Goodyear Tire & Rubber Co.* (1990), 66 Ohio App.3d 826, 829, 586 N.E.2d 1121, 1122–1123.

Pursuant to Civ.R. 56(C), summary judgment is proper if "(1) [n]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 O.O.3d 466, 471–472, 364 N.E.2d 267, 273–274; *Delker v. Ohio Edison Co.* (1989), 47 Ohio App.3d 1, 2, 546 N.E.2d 975, 976–977.

FELA claims were part of the appellants' original complaint filed in this case (specifically, Count I of the complaint). The Cool group argues that, since their FELA claims had not accrued as of the date they signed the releases, those claims may not be contracted away or released and, therefore, may not be considered waived by virtue of the buyout release agreements they signed with N & W. For the reasons stated below, we find this argument persuasive.

"Validity of releases under the Federal Employers' Liability Act raises a federal question to be determined by federal rather than state law." *Manis v. CSX Transp., Inc.* (N.D.Ohio 1992), 806 F.Supp. 177, 178, citing *Dice v. Akron, Canton & Youngstown RR Co.* (1952), 342 U.S. 359, 361, 72 S.Ct. 312, 314, 96 L.Ed. 398, 403. Though the release of FELA rights has been held subject to "special scrutiny" by the courts due to the nature of the rights involved, *S. Buffalo RR. Co. v. Ahern* (1953), 344 U.S. 367, 372–373, 73 S.Ct. 340, 342–343, 97 L.Ed. 395, 402; *Apitsch v. Patapsco & Back Rivers RR. Co.* (D.Md.1974), 385 F.Supp. 495, 503, the plaintiff bears the burden of showing the release to be invalid. *Callen v. Pennsylvania RR. Co.* (1948), 332 U.S. 625, 629–630, 68 S.Ct. 296, 298, 92 L.Ed. 242, 246; *Brophy v. Cincinnati, New Orleans & Texas Pacific RR. Co.* (S.D.Ohio 1994), 855 F.Supp. 213, 216.

The FELA at Section 55, Title 45, U.S. Code states as follows:

"Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this act * * * shall to that extent be void * * * ."

Moreover, "the 'purpose or intent' of such devices is to be found in their necessary operation and effect in defeating the liability which the statute was designed to enforce." *Apitsch, supra,* 385 F.Supp. at 504, citing *Philadelphia, Boston & Washington RR. Co. v. Schubert* (1912), 224 U.S. 603, 32 S.Ct. 589, 56 L.Ed. 911. Kirchner and Rush both admit that N & W was aware that the

release as worded had as one of its effects the release of FELA claims; it is, thus, readily apparent that the release in question had as at least part of its purpose and intent the waiver of potential FELA claims.

The trial court relied on the proposition, enunciated in *Callen,* 332 U.S. at 631, 68 S.Ct. at 298, 92 L.Ed. at 246, that "a release is not a device to exempt from liability but is a means of compromising a claimed liability and to that extent recognizing its possibility." However, in our opinion the trial court in the case *sub judice* did not go far enough in its analysis. The remainder of the quoted paragraph from *Callen* states as follows: "*Where controversies exist as to whether there is liability,* and if so for how much, Congress has not said that parties may not settle their claims without litigation." (Emphasis added.) *Id.* at 631, 68 S.Ct. at 298–299, 92 L.Ed. at 246.

■■ While such language seems to indicate that parties may indeed settle FELA claims via a release, it is clear that this only applies to claims which have already arisen *at the time the release is signed;* the release is valid only "where controversies exist," *i.e.,* where it disposes of an accrued FELA claim. Thus, while one can contract to settle or waive actual FELA *claims,* one may *not* similarly contract to waive all FELA *rights* with respect to claims which have not yet arisen.

■ In this case, the releases signed by the members of the Cool group were executed *prior* to the accrual of any FELA claim; the diagnoses of asbestos-related disease were not made until years after the releases had been signed. Thus, the broad and general "known and unknown" language of the release documents, particularly when coupled with the deposition testimony of N & W executives that the railroad intended the releases to extend to potential FELA claims, clearly constitutes a "contract" designed by N & W to "exempt itself from liability" under FELA.

■ "Congress [by enacting § 55] intended to remove the ability of employees to sell off their FELA rights in exchange for short term gains as well as the ability of employers to pressure or defraud their employees into signing away those rights.  * * *  In the instant case, the release goes beyond merely compromising a claimed liability and purports to exempt Defendant for all FELA liability arising out of Plaintiff's employment." *Brophy, supra,* 855 F.Supp. at 216.

■ "[G]eneral release language stating that 'any and all claims  * * * whether or not now known' does not prohibit claims unknown to the releasing party at the time a compromise is reached." *Manis, supra,* 806 F.Supp. at 179, citing *Forry, Inc. v. Neundorfer, Inc.* (C.A.6, 1988), 837 F.2d 259, 263.

The N & W release is, therefore, void under Section 55, Title 45, U.S.Code with respect to FELA rights, *i.e.,* FELA claims which have yet to accrue. It is this

sort of attempt at insulation from potential FELA liability which Section 55 was specifically intended to prevent. Such contracts have been determined by the United States Congress to be contrary to public policy, as indicated by the language expressed in Section 55.

In making this decision, we note that N & W claims that our position would conflict with those adopted by several other courts.[1] However, we are not convinced that the factual situations of the parties in any of those cases are similar to this, nor has N & W provided any evidence to that effect. With respect to the members of the Cool group, then, we hold that the release does not bar their FELA claims. The FELA claims, however, are the only ones entitled to such special scrutiny and protection; the remainder of the claims would be properly waived by the release, and at any rate are not presented as assignments of error on appeal. Moreover, since Fannin's cancer claim *had* already accrued at the time he signed his release, this analysis does not apply to his case.

Fannin, however, does not suffer only from multiple myeloma. On February 18, 1992, his doctor diagnosed him with what appeared to be asbestosis. Thus, Fannin's asbestos-related claims, like those of the Cool group, did *not* accrue until well after the signing of the release. The release is, therefore, invalid with respect to Fannin's asbestosis claims. We note that Fannin does not claim that it was asbestos exposure which caused his cancer.

We find that summary judgment was improper since N & W was not entitled to judgment as a matter of law. We, therefore, reverse the decision of the trial court with respect to Count I of the complaint only, and only with respect to the Cool group's claims and Fannin's asbestos-related claims. We need not consider the remaining assignments of error, as each asserts the invalidity of the release under the FELA, and we have already determined that a reversal is appropriate on that issue. None of the appellants has raised any non-FELA claims as assignments of error on appeal, although such claims were part of the complaint (Counts II, III, and IV).

The judgment of the trial court is, therefore, reversed. This matter is remanded to the trial court for further proceedings in accordance with this decision.

*Judgment reversed*
*and cause remanded.*

---

1. These include the United States District Court for the Northern District of Ohio (Eastern Division), in *Schmuck v. Norfolk & W. Ry. Co.* (1994), case No. 1:93CV1180, unreported; *Scholey v. Norfolk & W. Ry. Co.* (1994), case No. 5:93CV1862, unreported; the United States District Court for the Southern District of Ohio, in *Moody v. Norfolk & W. Ry. Co.* (1995), case No. C2–94–31, unreported; and the Eighth District Court of Appeals of Ohio, in *Klein v. Norfolk & W. Ry. Co.* (Nov. 8, 1990), Cuyahoga App. No. 59644, unreported, 1990 WL 173894.

SLABY and MAHONEY, JJ., concur.

EDWARD J. MAHONEY, J., retired, of the Ninth Appellate District, sitting by assignment.