PRESENT:  Lemons, C.J., Mims, McClanahan, Powell, Kelsey, McCullough, JJ., and Lacy, S.J.

ALAN BARRY COLE, AS EXECUTOR
OF THE ESTATE OF AARON JETHRO
COLE

OPINION BY
v.  Record No. 161163                            JUSTICE WILLIAM C. MIMS
                                                 August 31, 2017

NORFOLK SOUTHERN RAILWAY COMPANY

FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
Charles N. Dorsey, Judge

In this appeal, we consider whether a release of liability is void under the Federal

Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*

I.  Background and Procedural History

For more than 35 years, Aaron J. Cole worked as a machinist for Norfolk Southern

Railway Company ("NSRC").  During this time, he was regularly exposed to toxic substances

and dust, including asbestos.  In 1996, he filed a complaint in the circuit court alleging that he

contracted "occupational pneumoconiosis, including but not limited to asbestosis" as a result of

NSRC's negligence.  His complaint also alleged that he suffered

> from extreme nervousness, mental anxiety and fear of contracting
> mesothelioma, lung cancer and/or other cancers and/or other
> conditions caused by exposure to harmful and toxic dust and/or
> conditions including, but not limited to, cor pulmonale.  In
> addition, [Cole], because of his occupational pneumoconiosis, now
> has an increased risk of contracting mesothelioma, lung cancer,
> and/or other cancers and/or other conditions.

On May 15, 2000, the parties entered into a settlement agreement whereby Cole, who

was 78 years old and represented by counsel, signed a release of liability in exchange for

$20,000.  In pertinent part, the release states that Cole

> does hereby RELEASE AND FOREVER DISCHARGE [NSRC]
> . . . from all liability for all claims or actions for pulmonary-
> respiratory occupational diseases and/or other known injuries,

physical, mental or financial, suffered or incurred by [Cole], including, but not limited to: (a) medical, hospital and funeral expenses, (b) pain and suffering, (c) loss of income, (d) increased risk of cancer, (e) fear of cancer, (f) any and all forms of cancer, including mesothelioma[,] (g) and all costs, expenses and damages whatsoever, including all claims, debts, demands, actions, or causes of action of any kind, in law or equity, which [Cole] has or may have at common law or by statute or by virtue of any action under [FELA] . . ., in whole or in part, arising out of:

Exposure to toxic substances, including asbestos, silica, sand, coal dust, work place dust and all other toxic dusts, fibers, fumes, vapors, or mists used by NSRC during [Cole's] employment by NSRC.

On February 16, 2009, Cole was diagnosed with lung cancer; he died on November 14, 2010. Alan B. Cole, as the executor of Cole's estate, filed a complaint in the circuit court alleging under FELA that Cole's death was the direct and proximate result of NSRC's negligence. In a plea in bar, NSRC argued that the complaint should be dismissed because the claim was released as part of the settlement of Cole's 1996 asbestosis action. Cole responded that the release was void under § 5 of FELA, which states that

[a]ny contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this act . . . shall to that extent be void.

45 U.S.C. § 55.

Upon consideration of an evidentiary stipulation submitted by the parties, the circuit court granted NSRC's plea in bar. It acknowledged that a federal circuit split has resulted in two tests for evaluating the validity of releases under § 5 of FELA, but concluded that the release was valid under either test. We granted Cole this appeal.

2

II. Analysis

"The jurisdiction of the courts of the United States under [FELA] shall be concurrent with that of the courts of the several States." 45 U.S.C. § 56. However, "[s]tate courts are required to apply federal substantive law in adjudicating FELA claims." *Monessen Southwestern Ry. Co. v. Morgan*, 486 U.S. 330, 335 (1988); *Dice v. Akron, Canton & Youngston R.R. Co.*, 342 U.S. 359, 361 (1952) ("[U]niform application throughout the country [is] essential to effectuate [FELA's] purposes."). Thus, the "validity of releases under [FELA] raises a federal question to be determined by federal law rather than state law." *Id.* While we are bound by the decisions of the United States Supreme Court construing FELA, *Chesapeake & Ohio Ry. Co. v. Martin*, 283 U.S. 209, 220-21 (1931), there is no similar obligation with respect to decisions of the lower federal courts. *Toghill v. Commonwealth*, 289 Va. 220, 227, 768 S.E.2d 674, 677 (2015) (citing *Lockhart v. Fretwell*, 506 U.S. 364, 376 (1993) (Thomas, J., concurring) ("[N]either federal supremacy nor any other principle of federal law requires that a state court's interpretation of federal law give way to a (lower) federal court's interpretation.")).

A. Validity of Releases Under § 5 of FELA

FELA renders common carrier railroads liable in damages to any person suffering injury while employed by the carrier if the injury resulted in whole or in part from the carrier's negligence. 45 U.S.C. § 51. When FELA was enacted in 1908, "[t]he injury rate among railroad employees . . . was horrific – the average life expectancy of a switchman was seven years, and a brakeman's chance of dying from natural causes was less than one in five." Thomas E. Baker, Why Congress Should Repeal the Federal Employers' Liability Act of 1908, 29 Harv. J. on Legis. 79, 81-82 (1992). FELA therefore was designed to "shift[] part of the 'human overhead' of doing business from employees to their employers." *Conrail v. Gottshall*, 512 U.S. 532, 542

3

(1994) (quoting *Tiller v. Atlantic Coast Line R.R. Co.*, 318 U.S. 54, 58 (1943)). To that end, "Congress did away with several common-law tort defenses that had effectively barred recovery by injured workers." *Id.* As cataloged in *Gottshall*, FELA "abolished the fellow servant rule, rejected the doctrine of contributory negligence in favor of . . . comparative negligence," and, in a 1939 amendment, "abolished the assumption of risk defense." *Id.* at 542-43.

At issue in the present case, Congress also "prohibited employers from exempting themselves from FELA through contract." *Id*. at 543. As noted, § 5 of FELA provides that

> [a]ny contract, rule, regulation, or device whatsoever, the purpose
> or intent of which shall be to enable any common carrier to exempt
> itself from any liability created by this act, shall to that extent be
> void.

45 U.S.C. § 55. This section was primarily aimed at two specific practices. First, many railroads required employees to sign "a contract of employment which by its terms released the company from liability for damages arising out of the negligence of other employees." H.R. Rep. No. 1386, 60th Cong., 1st Sess. 6 (1908). Second, it was common for railroads to utilize relief agreements, whereby the railroad would provide benefits to injured workers conditioned on a waiver of any claims against the railroad. *Philadelphia, Balt. & Wash. R.R. v. Schubert*, 224 U.S. 603, 612 (1912) ("The practice of maintaining relief departments, which had been extensively adopted, and of including in the contract of membership provision for release from liability [by] employe[e]s who accepted benefits, was well known to Congress" when it enacted § 5 of FELA.).

"Shortly after FELA's adoption, the [United States] Supreme Court began to establish the boundaries of § 5." *Wicker v. Conrail*, 142 F.3d 690, 696 (3d Cir. 1997). In *Schubert*, for example, an employee contributed a portion of his salary to a relief fund established by his railroad employer until he was injured. 224 U.S. at 606. After accepting benefits from the relief

4

fund, he filed a FELA claim against the railroad for damages related to his injury. *Id.* at 607-08. The railroad argued that his claim was barred because his acceptance of benefits from the relief fund was conditioned upon the release of all claims against the railroad. *Id*. at 606-08. The Supreme Court held that the release directly violated § 5 of FELA because its purpose was to provide the railroad with immunity from liability. *Id.* at 611-12.

The Supreme Court revisited the issue in *Duncan v. Thompson*, 315 U.S. 1 (1942). There, an injured employee signed a contract whereby he accepted $600 to cover living expenses upon the condition that he return the money before bringing any claim against the employer. *Id*. at 3. He nevertheless filed a FELA claim without refunding the $600, and the employer raised the contract as a defense. *Id.* The Supreme Court held that the contract was void under § 5 of FELA because, in light of the employee's dire financial circumstances, the contract's "purpose or intent" was "to exempt [the railroad] from any liability" under FELA. *Id*. at 7.

However, § 5 of FELA is not without limitations. In *Callen v. Pennsylvania Railroad Company*, 332 U.S. 625, 626 (1948), an employee brought a FELA action after injury to his back in the course of his employment. After his injuries, but prior to filing suit, the employee executed a general release freeing the railroad from liability in exchange for $250. *Id*. at 626-27. While the primary issue on appeal was the accuracy of certain jury instructions, the Court also dismissed an argument raised by the employee that the release was void under § 5 of FELA. *Id.* at 627-31. The Court held that

> [i]t is obvious that a release is not a device to exempt from liability but is a means of compromising a claimed liability and to that extent recognizing its possibility. Where controversies exist as to whether there is liability, and if so for how much, Congress has not said that parties may not settle their claims without litigation.

*Id.* at 631.

5

B. Circuit Split

Application of § 5 of FELA remains unclear in many respects. The United States Supreme Court has not clarified what constitutes a "controversy" that parties may settle without litigation. *Wicker*, 142 F.3d at 698 ("Although the Supreme Court in *Callen* refused to void the releases executed in compromise of an employee's claims, the Court has not had occasion to explain how wide a net its ruling casts."). Courts have diverged when a release attempts to extinguish claims for known injuries and also for known risks of future injuries that have yet to, and may never, manifest. That is the question we address here.

A circuit split has developed regarding the validity of such releases. In *Babbitt v. Norfolk & Western Railway Company*, 104 F.3d 89 (6th Cir. 1997), the United States Court of Appeals for the Sixth Circuit employed what has become known as the "bright-line test." In that case, several employees of a railroad signed a general release of claims as part of a voluntary separation program terminating their employment. *Id.* at 90. They subsequently sued, alleging that the railroad negligently exposed them to excessive noise levels causing hearing loss. *Id.* The district court granted the railroad's motion for summary judgment on the ground that the release barred the claims. *Id.* at 90. On appeal, the court reasoned that

> where there exists a dispute between an employer and employee with respect to a FELA claim, the parties may release their specific claims as part of an out-of-court settlement without contravening the Act. However, where the release was not executed as part of a specific settlement of FELA claims, 45 U.S.C. § 55 precludes the employer from claiming the release as a bar to liability. To be valid, a release must reflect a bargained-for settlement *of a known claim for a specific injury*, as contrasted with an attempt to extinguish potential future claims the employee might have arising from injuries *known or unknown* by him.

*Id.* at 93 (emphases added) (internal citations omitted). The court then reversed the grant of summary judgment and remanded the case for a determination of "whether the [r]elease was

6

executed as part of a settlement for damages sustained for the [employees'] specific [hearing loss] injuries." *Id.*

However, this bright-line test was rejected by the United States Court of Appeals for the Third Circuit in *Wicker.* 142 F.3d at 701. In *Wicker*, five employees sued their former employer under FELA for injuries resulting from exposure to toxic chemicals. *Id.* at 692. Each employee had previously executed a general release in the course of settling *unrelated* FELA claims. *Id.* These releases "appeared to settle all claims for all injuries past and future." *Id.* In addressing the validity of these releases, the court acknowledged that for a release to be valid under FELA, it must "at least have been executed as part of a negotiation settling a dispute between the employee and the employer." *Id.* at 700. It then stated that in such a negotiation,

> it is entirely conceivable that both employee and employer could fully comprehend future risks and potential liabilities and, for different reasons, want an immediate and permanent settlement . . . . To put it another way, the parties may want to settle controversies about potential liability and damages related to known risks even if there is *no present manifestation* of injury.

*Id.* at 700-01 (emphasis added). Accordingly, the court implemented a fact-intensive approach that has become known as the "risk of harm" test. Under this test,

> a release does not violate [FELA] provided it is executed for valid consideration as part of a settlement, and the scope of the release is limited to those risks which are known to the parties at the time the release is signed. Claims relating to unknown risks do not constitute "controversies," and may not be waived under § 5 of FELA.

*Id.* at 701 (citing *Callen*, 332 U.S. at 631). The *Wicker* court then provided significant guidance for the application of its risk of harm test. It noted that determining whether a "known risk" was released is a "fact-bound" inquiry that must examine the "parties' intent at the time the agreement was made." *Id.* at 700. It observed that the language of a release may be "strong, but

7

not conclusive, evidence of [this] intent." *Id.* at 701. Thus, "where a release merely details a laundry list of diseases or hazards, the employee may attack that release as boilerplate, not reflecting his or her intent." *Id.*

As both the *Babbitt* and *Wicker* courts acknowledged, for a release to survive § 5 of FELA, *Callen* requires that it be executed pursuant to the settlement of an existing controversy. *Wicker*, 142 F.3d at 700 ("To be valid under FELA, a release must at least have been executed as part of a negotiation settling a dispute between the employee and the employer."); *Babbitt*, 104 F.3d at 93 ("[W]here [a] release was not executed as part of a specific settlement of FELA claims, 45 U.S.C. § 55 precludes the employer from claiming the release as a bar to liability."). That is, the release must relate to a specific claim, such as a railroad's liability for injuries caused by asbestos exposure, as opposed to a broad release exempting a railroad from liability for any occupational illness. The opinions in *Schubert* and *Duncan* confirm that releases executed outside of this context are void.

However, *Babbitt*'s bright-line test also dictates that even if executed in this context, a release may not "extinguish potential future claims the employee might have arising from injuries known or unknown by him," but rather only "*the specific injur[y] in controversy.*" *Babbitt*, 104 F.3d at 93 (emphasis in original). Due to this broad wording, courts have interpreted *Babbitt* as holding that a release must relate to a settlement for specific injuries caused by a particular accident or exposure and that the employee must be suffering from the injury sought to be released when the release is executed. *Jaqua v. Canadian Nat'l R.R.*, 734 N.W.2d 228, 234 (Mich. App. 2007) (observing that *Babbitt* requires that the employee "must be suffering from the precise injury raised in the later FELA action" when the release is signed); *Wicker*, 142 F.3d at 700 ("A bright line rule like the one set forth in *Babbitt*, limit[s] the release

8

to the *injuries known to the employee* at the time the release is executed.") (emphasis added);

*Illinois Cent. R.R. v. Acuff*, 950 So.2d 947, 960 (Miss. 2006) ("*Babbitt*'s rule barring the release

of *future claims* unfairly restricts the ability of an employer and employee to knowingly and

voluntarily settle both current and future claims, should the parties so desire.") (emphasis added).

In other words, under the bright-line test, a release executed as part of a negotiated

settlement for a specific injury or claim cannot release a future claim for an additional injury that

may develop from the same accident or exposure, even if the additional injury is contemplated

by the parties and explicitly contained in the release. *Jaqua*, 734 N.W.2d at 234. However,

nothing in *Callen*, *Duncan*, or *Schubert* suggests that § 5 of FELA was intended to have such a

limiting effect on the ability of parties to settle their FELA claims. Indeed, the bright-line test

> "requires an unrealistic view on how parties compromise
> claims. . . . This is particularly true with respect to claims based
> upon exposure to asbestos, where effects of the exposure may be
> latent for a considerable period of time. If a new claim were
> permitted for each and every new manifestation of the asbestos
> exposure, regardless of the extent of the parties' awareness of such
> risks, there would be no incentive on the part of the railroad
> defendant to ever compromise such claims. This result would not
> further the public policy of encouraging settlement of claims."

*Id.* at 236 (quoting *Oliverio v. Consolidated Rail Corp.*, 822 N.Y.S.2d 699, 701-02 (2006)).

We therefore conclude that the risk of harm test provides the better rule, permitting the

enforcement of a release not only for the specific injuries already manifested at the time of its

execution, but also for known risks of future injuries from the same accident or exposure.[1] *See*

---

[1] In reaching this conclusion, we note that the risk of harm test has been adopted by the majority of courts that have considered the issue. *See, e.g.*, *Sea-Land Serv., Inc. v. Sellan*, 231 F.3d 848, 851 (11th Cir. 2000); *Loyal v. Norfolk S. Corp.*, 507 S.E.2d 499, 502 (Ga. Ct. App. 1998); *Acuff*, 950 S.2d at 960; *Jaqua,* 734 N.W.2d at 235-36; *Sinclair v. Burlington N. & Santa Fe Ry.*, 200 P.3d 46, 59 (Mont. 2008); *see also* Brooke Granger, Comment: Known Injuries vs. Known Risks: Finding the Appropriate Standard for Determining the Validity of Releases Under the Federal Employers' Liability Act, 52 Hous. L. Rev. 1463, 1482 (Spring 2015) (*Wicker*'s

*Loyal v. Norfolk S. Corp.*, 507 S.E.2d 499, 502 (Ga. App. 1998) (in an industry where claims for occupational diseases are common, "it is important to both the employer and employee to be able to settle potential claims regarding injuries or diseases prior to actual discovery").

   C.  Application of the Risk of Harm Test

Under the risk of harm test, a release "does not violate § 5 [of FELA] provided it is executed for valid consideration as part of a settlement, and the scope of the release is limited to those risks which are known to the parties at the time the release is signed.  Claims relating to unknown risks do not constitute 'controversies,' and may not be waived under § 5 of FELA." *Wicker*, 142 F.3d at 701.[2]  The focus of this test is not on whether the language of a release explicitly includes a known risk of future injury, but whether the employee intended to release liability for this known risk.  A release's language may be "strong, but not conclusive, evidence of" this intent.  *Id.*  But "where a release merely details a laundry list of diseases or hazards, the employee may attack that release as boilerplate, not reflecting his or her intent."  *Id.*

Determining the intent of the parties at the time a release is executed is necessarily "a fact-intensive process."  *Id.*  In the present case, this question of fact was presented to the circuit court in the context of NSRC's plea in bar.  "A plea in bar asserts a single issue, which, if proved, creates a bar to a plaintiff's recovery."  *Hawthorne v. VanMarter*, 279 Va. 566, 577, 692 S.E.2d 226, 233 (2010).  Where, as here, facts are disputed, "the 'whole matter of law and fact' may be decided by the court."  *Id.* at 578, 692 S.E.2d at 234.  In such cases, "the circuit court's

---

"known risk standard has proven to be more popular than the application of the Sixth Circuit's bright line, known injury rule.").

   [2] It is not contested that when Cole signed the release he was represented by counsel and engaged in "a negotiation settling" an existing controversy.  *Wicker*, 142 F.3d at 700.  These circumstances are significantly distinguishable from the practices Congress was targeting with § 5 of FELA, such as railroads requiring employees to sign "a contract of employment which by its terms released the company from liability for damages arising out of the negligence of other employees."  H.R. Rep. No. 1386, 60th Cong., 1st Sess. 6 (1908).

factual findings are accorded the weight of a jury finding and will not be disturbed on appeal unless they are plainly wrong or without evidentiary support." *Id.* at 577, 692 S.E.2d at 233 (citing *Jennings v. Kay Jennings Family Ltd. P'ship*, 275 Va. 594, 600, 659 S.E.2d 283, 287 (2008)).

In this case, the circuit court found as fact that when Cole signed the release "he had contemplated his injuries; he knew of the possible future effects of his injuries [including the risk of developing cancer]; and he was ready and willing to release [NSRC] from those claims." This finding is binding on appeal because it is not plainly wrong or without evidentiary support. First, the release specifically purports to release NSRC from "all liability for claims or actions for pulmonary-respiratory occupational diseases . . . including . . . increased risk of cancer, . . . fear of cancer, . . . [and] any and all forms of cancer, including mesothelioma." While this language is not "conclusive," it is nonetheless "strong . . . evidence" that Cole intended to release all future cancer claims that might arise from his exposure to asbestos. *Wicker*, 142 F.3d at 701.

Next, and most significantly, the release's language is similar to much of the wording contained in Cole's 1996 asbestosis complaint. There, Cole specifically put at issue his "fear of contracting . . . lung cancer and/or other cancers" and "increased risk of contracting mesothelioma, lung cancer, and/or other cancers," demonstrating that he was aware of these risks. He then settled this claim with a release that specifically absolved NSRC from "any" liability related to Cole's "increased risk of cancer, . . . fear of cancer, . . . [and] any and all forms of cancer." Given this similar wording, it was reasonable for the circuit court to conclude that when the parties executed the release they knew, and intended to resolve, all the issues raised in Cole's complaint, including any future cancer claims arising from his exposure to asbestos.

11

Nevertheless, Cole argues that the circuit court should have determined that the release was invalid under the risk of harm test because it contains "boilerplate." However, the risk of harm test does not dictate that all releases containing such commonly-used provisions are void. Rather, the Third Circuit merely said in *Wicker* that such a release may be attacked by an employee as not reflecting his intent. Cole did attack the release on this basis in the proceedings below, but the circuit court nevertheless found that the evidence demonstrated Cole's intent to release any future claim for lung cancer. The fact-intensive risk of harm test is intentionally designed to allow trial courts to resolve these sorts of factual questions. *Wicker*, 142 F.3d at 701 ("We recognize that [the risk of harm test] is a fact-intensive process, but trial courts are competent to make these kinds of determinations.").[3]

In sum, the circuit court's factual conclusion that Cole intended to release all future cancer claims when he executed the release, including the present lung cancer claim, is not plainly wrong or without evidentiary support. Thus, applying the risk of harm test, the release of this claim did not violate § 5 of FELA.[4]

D. *Norfolk & Western Railway v. Ayers*

In his second assignment of error, Cole argues that the circuit court erred by failing to hold that the release was void as a result of the United States Supreme Court's decision in

---

[3] Cole also argues that the $20,000 he received for executing the release was so "meager" that it suggests he did not understand that he was releasing claims for potentially life-threatening illnesses. Again, this factual argument was rejected by the circuit court, and we will not reweigh the evidence on appeal. In any event, Cole was 78 years old when he was offered $20,000 to waive any claim for a disease he had yet to and may never develop. Considering these circumstances, the compensation he received was not so insignificant as to demonstrate that Cole was not aware he was waiving future cancer claims. *See Wicker*, 142 F.3d at 700 ("[I]t is entirely conceivable that both employee and employer could fully comprehend future risks and potential liabilities and, for different reasons, want an immediate and permanent settlement.").

[4] Because we adopt the risk of harm test, we do not address Cole's argument that the circuit court erred in its application of *Babbitt*'s bright-line test.

12

*Norfolk & Western Railway v. Ayers*, 538 U.S. 135 (2003). In *Ayers*, the Supreme Court indicated, in dicta, that a plaintiff who successfully recovers for an asbestosis claim "may bring a second [FELA] action if cancer develops" despite the fact that both diseases arose from the same asbestos exposure. *Id.* at 152-53 & n.12. From this comment, Cole reasons that the critical inquiry when determining whether a controversy exists is whether the claim sought to be released has accrued at the time the release is signed. If a claim has yet to accrue, Cole suggests that it is not a controversy that may be released under § 5 of FELA.

This argument mirrors the approach taken by the Court of Appeals of Ohio in *Fannin v. Norfolk & Western Railway*, 666 N.E.2d 291 (Ohio Ct. App. 1995), a case upon which Cole heavily relies. In *Fannin*, the court began by acknowledging, in accordance with *Callen*, that "where controversies exist" parties may settle FELA claims without offending § 5 of FELA. *Id.* at 295. However, the court reasoned that *Callen*'s holding "only applies to claims which have already arisen *at the time the release is signed*." *Id.* (emphasis in original). That is, a "release is valid only . . . where it disposes of an accrued FELA claim." *Id.* It therefore concluded that a release that attempts to waive a claim prior to its accrual is an attempt by the railroad to "exempt itself from liability" and void under § 5 of FELA. *Id.* at 295-96.

Cole's argument is not persuasive. First, in *Ayers*, the United States Supreme Court did not address the release of claims under § 5 of FELA. Its primary holding was that a plaintiff may, after successfully prosecuting an *asbestosis* claim, recover damages for "mental anguish . . . resulting from the fear of developing cancer." 538 U.S. at 295-96. In reaching this conclusion, the Court seemed to affirm in dicta that asbestosis claimants may bring a second action if cancer later develops from the same asbestos exposure. *Id.* at 152-53 & n.12. But plainly this dicta

13

does not demand the result for which Cole advocates. While an employee who has previously recovered for asbestosis may bring a second claim if cancer later develops, this does not mean that he cannot settle his known risk of a future cancer claim as part of his initial asbestosis action if desired. This is especially true where, as here, the asbestosis complainant places the increased risk of future cancer at issue in his complaint. *See id.* at 153 (observing that the "asbestosis claimants [in *Ayers*] did not seek, and the trial court did not allow, discrete damages for their *increased risk* of future cancer") (emphasis in original).

As the opinion in *Ayers* does not compel us to adopt the approach taken by the Ohio Court of Appeals in *Fannin*, we reject it for the same reasons we reject the bright-line test. It represents an overly narrow reading of *Callen* that requires an employee to be actually suffering from an injury before it can be released. There is nothing to suggest that § 5 of FELA was intended to place such a limiting effect on the ability of parties to settle known risks of future claims without litigation. The approach taken in *Fannin*, like the bright-line test, requires an unrealistic view of how parties compromise claims.

### III.   Conclusion

Under the risk of harm test, which we adopt as the rule of decision in the Commonwealth, a release does not violate § 5 of FELA if it is executed as part of a negotiated settlement of a FELA claim and is limited to those risks that were known to the parties at the time of its execution. The focus of this test is not whether a release explicitly lists a potential future claim, but whether the parties intended to release such a claim. The evidence in the present case supports the circuit court's factual finding that Cole intended to release the present lung cancer claim as part of the settlement of his asbestosis action. Accordingly, applying the risk of harm

14

test, the release in 2000 of the present lung cancer claim was not void under § 5 of FELA. We therefore affirm the circuit court's judgment.

*Affirmed.*