# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-CA-00285-SCT

*ANDREW L. WARD, JR., AS PERSONAL
REPRESENTATIVE OF LARRY AND MILDRED
SEWARD, DECEASED*

*v.*

*ILLINOIS CENTRAL RAILROAD COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/30/2018 |
| TRIAL JUDGE: | HON. CELESTE EMBREY WILSON |
| TRIAL COURT ATTORNEYS: | PATRICK STEVEN O'BRIEN |
| | CHARLES EDWARD SOREY, II |
| | STEPHANIE CAMILLE REIFERS |
| | BROOKS E. KOSTAKIS |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CHARLES EDWARD SOREY, II |
| | PATRICK STEVEN O'BRIEN |
| ATTORNEYS FOR APPELLEE: | STEPHANIE CAMILLE REIFERS |
| | THOMAS R. PETERS |
| | BROOKS E. KOSTAKIS |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED - 05/23/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.     Andrew L. Ward sued Illinois Central Railroad Company on behalf of Larry Seward.

Ward alleged that Illinois Central breached its duty of care and failed to provide Seward with

a safe place to work, allegedly causing Seward's brain cancer. Illinois Central filed a motion

for summary judgment based on a previous settlement and release that Seward had entered

into with Illinois Central before his death. The trial court granted Illinois Central's motion for summary judgment. Ward appealed the trial court's grant of summary judgment. The Court affirms.

**STATEMENT OF FACTS**

¶2.     Larry Seward worked for Illinois Central Railroad Company from 1961 to 2004. In 2005, Seward settled an asbestosis claim with Illinois Central. He subsequently developed and passed away from anaplastic oligodendroglioma, a type of brain cancer.

¶3.     In 2012, Andrew L. Ward sued Illinois Central on behalf of Seward. Ward alleged that Illinois Central breached its duty of care and failed to provide Seward with a safe place to work. The complaint detailed specific issues with the work environment, including Seward's exposure to chemicals and hazardous conditions. The complaint alleged that the working environment "caused, in whole or in part," Seward's brain cancer.

¶4.     Illinois Central filed a motion for summary judgment based on the settlement and release that Seward signed in 2005. The 2005 settlement was due to an asbestos-related illness. In pertinent part, the release provided,

> [T]he Undersigned alleges [that Releasees (Illinois Central)] created an exposure or exposures to asbestos, coal, coal dust, welding fumes, brass fumes, diesel fumes, dust, paint vapors, fuel fumes, methyl bromide, ammonia gas, sand, silica, Dow Clean, solvents, cleaners, degreasers, and other fumes, dusts, mists, gases, and vapors from any material, chemical, toxin or other agent. The Undersigned asserts that such exposure caused a condition, injury, disease and/or deficiency (hereinafter, referred to as "condition") in the Undersigned including, but not limited to plaques, calcifications, thickening, pneumoconiosis including asbestosis and silicosis, severe and permanent injuries to the lungs, respiratory system, nerves and/or nervous system, cancer, and any and all other conditions, diseases or injuries existing prior to the date of this Release Agreement which are known to the Undersigned or reasonably could have been known prior to the date of this Release Agreement and which

2

may further develop in the future as a result of what now exists, arising from or as a result of the alleged exposures or which may further develop as a result of the Undersigned's current known or unknown conditions, which allegedly developed over time while working in one or more of the Releasees employ, which are expressly released herein.

In the process of making the settlement, Illinois Central asked Seward to fill out its "Pulmonary Questionnaire." The pulmonary questionnaire asked Seward to "[p]lease check all chemicals you allege exposures from while employed at Illinois Central." Seward placed an "x" or a check mark next to asbestos, diesel exhaust, silica, solvents, degreasers, coal, chemicals and weed spray. He also checked that he had been diagnosed with asbestosis, bronchitis and pneumonia.

¶5.    Ward presented the testimony of Robert Peirce Jr. Peirce was Seward's attorney at the time of the 2005 settlement and release. Peirce's affidavit stated that "Mr. Seward and myself were unaware that Mr. Seward has suffered exposures to chemical which would ultimately cause him to contract primary brain cancer . . . ." Peirce further provided that he "did not negotiate or obtain any monies from Illinois Central Railroad Company to compensate Mr. Seward for anything other than his lung injury" and if he "[h]ad known that Mr. Seward would subsequently develop anaplastic oligodemdroglioma or any other occupational cancer not listed in the Complaint or Release [he] would have demanded additional compensation for Mr. Seward." Peirce also provided the following deposition testimony:

> Q.    You agree with me that these questionnaires ask about exposure beyond asbestos to each of these individuals; correct?
>
> A.    No, I don't agree with that.

3

Q. What do you think the purpose of question 3A is?

A. It says check all the chemicals you allege exposure from while employed at Illinois Central.

Q. So do you think they're looking for exposures beyond just asbestos in answer to that question?

A. No.

Q. What do you think they're looking for?

A. I think they're looking for asbestos exposure.

. . . .

Q. Is it your position the railroad didn't want to know that they were exposed to diesel exhaust, they just wanted to know if they were exposed to asbestos?

A. No. But I believe exposure to diesel exhaust could be a contributing force in asbestosis.

Q. How is that?

A. Well, I think that some people believe that exposure to diesel exhaust can cause asbestosis or asbestosis-related diseases. So that's probably why it was included in there.

¶6. The trial court granted Illinois Central's motion for summary judgment.[1] The trial court concluded that "[t]he Plaintiff has failed to provide any evidence that would create a question of fact as to whether Mr. Seward did not contemplate (or otherwise have the opportunity to contemplate) the risks of his exposure to the above-listed toxins when he settled his prior claims." Ward appealed the trial court's grant of summary judgment.

---

[1]Although Illinois Central brought other motions, the grant of summary judgment is the only motion addressed by the parties on appeal.

## STATEMENT OF THE ISSUE

¶7.     Although the parties style the issue slightly differently, both parties agree that the only issue on appeal is whether summary judgment was properly granted.

## STANDARD OF REVIEW

¶8.     The Court applies de novo review to the grant or denial of summary judgment. *Ill. Cent. R.R. Co. v. Jackson*, 179 So. 3d 1037, 1044 (Miss. 2015) (citing *Serv. Cos., Inc. v. Estate of Vaughn*, 169 So. 3d 875, 878 (Miss. 2015)). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c). "A fact is material if it tends to resolve any of the issues properly raised by the parties." *Holland v. Peoples Bank & Tr. Co.*, 3 So. 3d 94, 99 (Miss. 2008) (internal quotation marks omitted) (quoting *Simpson v. Boyd*, 880 So. 2d 1047, 1050 (Miss. 2004)). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Jackson*, 179 So. 3d at 1044 (citing *Hoseman v. Harris*, 163 So. 3d 263, 267 (Miss. 2015)). Further, the Court has provided,

> "A motion for summary judgment should be overruled unless the trial court finds, beyond a reasonable doubt, that the plaintiff would be unable to prove any facts to support his claim." The lower court is prohibited from trying the issues; "it may only determine whether there are issues to be tried." The non-moving party . . . has the burden of providing "'supportive evidence of significant and probative value' in opposition to the motion for summary judgment."

*Palmer v. Anderson Infirmary Benevolent Ass'n*, 656 So. 2d 790, 795–96 (Miss. 1995) (emphasis removed) (citations omitted).

ANALYSIS

**Whether the trial court erred in granting Illinois Central Railroad Company's motion for summary judgment.**

¶9.     This case is governed by the Federal Employers' Liability Act (FELA).  "FELA was designed 'to enable injured railroad workers to overcome a number of traditional defenses to tort liability that had previously operated to bar their actions.'" *Wicker v. Consol. Rail Corp.*, 142 F.3d 690, 696 (3d Cir. 1998) (quoting *Lewy v. S. Pac. Transp. Co.*, 799 F.2d 1281, 1287 (9th Cir. 1986)).   In pertinent part, FELA provides, "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void . . . ." 45 U.S.C.A. § 55 (West 2007).[2]

¶10.    Courts around the country have adopted different approaches to interpreting  Section 5 of the FELA.  In *Wicker*, the United States Court of Appeals for the Third Circuit stated that "[t]o the extent that a release chronicles the scope and duration of the known risks, it would supply strong evidence in support of the release defense." *Wicker*, 142 F.3d at 701. In *Illinois Central Railroad Co. v. Acuff*, the Court adopted *Wicker*'s "known risk" test.[3] *Ill.*

---

[2]45 U.S.C.A. § 55 is also referred to as Section 5 of the FELA.

[3]An employee negotiating a claim for an existing controversy materially differs from an employee agreeing to a voluntary end to his or her employment and not negotiating the settlement of an existing controversy. *Ratliff v. Norfolk S. Ry. Co.*, 680 S.E.2d 28, 38 (W. Va. 2009) (citing *Babbitt v. Norfolk & W. Ry. Co.*, 104 F.3d 89 (6th Cir. 1997)); *see also Wicker*, 142 F.3d at 700.  For an employee agreeing to a voluntary end to his or her employment, the *Babbitt* Court employed a bright-line rule stating that a release is only valid when it reflects "a bargained-for settlement of a known claim for a specific injury . . . ." *Babbitt*, 104 F.3d at 93. Some courts have noted the material factual difference between the application of the *Babbitt* and *Wicker* tests. *See Wicker*, 142 F.3d at 700; *Ratliff*, 680 S.E.2d

*Cent. R.R. Co. v. Acuff*, 950 So. 2d 947, 960 (Miss. 2006) ("[U]nder the specific language of Section 5 of the FELA and United States Supreme Court precedent, we find the Third Circuit's approach allowing the release of future claims based on specific risks known to the parties to be appropriate.").

¶11. Ward argues that the trial court overlooked the existence of the affidavit and the deposition testimony of Peirce, Seward's attorney. Ward concludes that Peirce's testimony makes Seward's intent a fact-intensive inquiry. Further, Ward argues that the determination of whether the release was boilerplate is also a jury issue. On the other hand, Illinois Central compares this case to *Acuff* and argues that summary judgment was appropriate. Illinois Central points to the release and to the pulmonary questionnaire and states that they are "limited to specific known risks." Further, Illinois Central states that Peirce's testimony was "immaterial and insufficient to create a material issue of fact in light of the other undisputed evidence."

¶12. Here, under *Acuff* and *Wicker*, the inquiry is two-fold. The Court considers whether the release at issue is boilerplate and whether the risk of developing brain cancer was known and contemplated by Seward at the time he signed the release.

¶13. Notably, *Wicker* explained the importance of allowing parties the right to quantify and limit future liabilities. It stated that "the parties may want to settle controversies about potential liability and damages related to known risks even if there is no present

at 38.

7

manifestation of injury." *Wicker*, 142 F.3d at 700–01. Further, although *Wicker* supported the use of releases, it also qualified the power of the release, stating,

> But we are wary of making the validity of the release turn on the writing alone because of the ease in writing detailed boiler plate [sic] agreements; draft releases might well include an extensive catalog of every chemical and hazard known to railroad employment. For this reason, we think the written release should not be conclusive. We recognize that what is involved is a fact-intensive process, but trial courts are competent to make these kinds of determinations.

*Id.* at 701. The release "may be strong, but not conclusive, evidence of the parties' intent."

*Id. Wicker* defined specific situations requiring a fact-intensive inquiry: "[w]here a specific known risk or malady is not mentioned in the release, it would seem difficult for the employer to show it was known to the employee and that he or she intended to release liability for it[,]" and "where a release merely details a laundry list of diseases or hazards, the employee may attack that release as boiler plate [sic], not reflecting his or her intent." *Id.* To determine if the release was boilerplate, the *Wicker* Court looked to the language of the release. The *Wicker* Court differentiated between releases that "recite a series of generic hazards to which [the employee] might have been exposed" and releases that provide "specific risks the employees faced during the course of their employment." *Id.*

¶14. The *Acuff* Court faced facts similar to this case, including an affidavit from the attorney involved in the original lawsuit. *Acuff*, 950 So. 2d at 958. However, in *Acuff*, Illinois Central filed a motion to enforce the settlement agreement, and the parties agreed to have the trial judge determine all issues of law and fact. *Id.* at 952. The trial judge treated the known-risk analysis as fact-intensive and sat as the finder of fact. *Id.* On appeal, the

8

Court applied an abuse-of-discretion standard of review.[4] *Id.* Therefore, although we cite *Acuff* for its adoption of *Wicker*, it provides little guidance regarding whether a contested issue of material fact exists.

¶15. Because the caselaw in Mississippi is limited, the Court looks to other states and federal courts for guidance. *Wicker* has been applied supporting and rejecting the grant of summary judgment.

¶16. In *Jaqua v. Canadian National Railroad, Inc.*, 734 N.W.2d 228 (Mich. Ct. App. 2007), the Court of Appeals of Michigan noted the specificity within the release at issue and granted summary judgment. *Id.* at 337. The *Jaqua* Court stated, "Jaqua specifically settled claims regarding cancer as well as any other illnesses related to his asbestos exposure. The release addressed a specific instance of disputed liability and specific injuries that Jaqua suffered, or was at great risk of suffering in the future—asbestosis and lung cancer." *Id.* (footnote omitted).

¶17. Similarly, in *Blackwell v. CSX Transportation, Inc.*, 102 A.3d 864 (Md. Ct. Spec. App. 2014), the Court of Special Appeals of Maryland affirmed the grant of summary judgment. *Id.* at 873. It adopted *Wicker* and held that the first release contemplated the second suit. *Id.* Specifically, it held that the first release had released CSX Transport from "any new or additional repetitive stress or cumulative trauma injury either presently existing or that may arise in the future to the lower extremities or other body parts." *Id.* Blackwell's

---

[4]Similarly, in *Illinois Central Railroad Co. v. McDaniel*, 951 So. 2d 523, 525 (Miss. 2006), Illinois Central filed a motion to enforce the settlement agreement. The Court reviewed the trial court's findings under an abuse-of-discretion standard of review. *Id.* at 526.

subsequent suit was due to "bilateral plantar fasciitis," an injury to his lower extremity; therefore, the court concluded that the first release specifically contemplated the second suit. *Id.*

¶18.    Courts have also looked to *Wicker* to conclude that the interpretation of releases is fact-intensive and to support denial of summary judgment. *Wicker*, 142 F.3d at 701. The Supreme Court of Virginia recently addressed the application of *Wicker*'s known-risk test to a settlement and release. *Cole v. Norfolk S. Ry. Co.*, 803 S.E.2d 346, 352 (Va. 2017). Similar to *Acuff*, the analysis was fact-intensive, and the trial judge sat as the finder of fact. *Id.* at 353.

¶19.    Further, in *Sinclair v. Burlington Northern and Santa Fe Railway Co.*, 200 P.3d 46 (Mont. 2008), the Supreme Court of Montana applied *Wicker* and denied summary judgment. The *Sinclair* Court considered the lack of specificity within the release, stating that "the release does not even specifically mention exposure to manganese poisoning at all." *Id.* at 60. The court then denied summary judgment, concluding that "the language of the release in this case is not sufficient to show an absence of a genuine issue of material fact . . . ." *Id.*

¶20.    The Court now turns to the specific language of this release which it states,

> The Undersigned asserts that such exposure caused a condition, injury, disease and/or deficiency (hereinafter, referred to as "condition") in the Undersigned including, but not limited to plaques, calcifications, thickening, pneumoconiosis including asbestosis and silicosis, severe and permanent injuries to the lungs, respiratory system, nerves and/or nervous system, *cancer*, and any and all other conditions, diseases or injuries existing prior to the date of this Release Agreement which are known to the Undersigned or reasonably could have been known prior to the date of this Release Agreement and which may further develop in the future as a result of what now exists . . . .

10

(Emphasis added.) Turning to our summary-judgment standard, the question is whether "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c). Here, the parties disagree on whether Peirce's testimony creates a genuine issue of material fact.

¶21.    The first question is whether the language is boilerplate. Although the release does not address the development of anaplastic oligodemdroglioma, it does clearly provide for the release of cancer. No dispute exists that anaplastic oligodemdroglioma is a type of cancer. Like in *Blackwell*, although the exact name of the illness was not listed on the release, the illness provided is still sufficiently specific. *See Blackwell*, 102 A.3d at 873; *see also Wicker*, 142 F.3d at 701 (upholding releases that provide "specific risks the employees faced during the course of their employment"). Peirce did not testify regarding whether the release's language was boilerplate. While the dissent maintains that Seward's release is not distinguishable from the releases in *Wicker* as far as an inclusive list of chemical exposures and diseases are concerned, Seward's release is more specific and limited than the *Wicker* releases. Diss. ¶30. The releases in *Wicker* released the railroad from injuries "known or unknown" and, in Wicker's release, "foreseen or unforeseen." *Wicker*, 142 F.3d at 693–94. Also, if they included any list of exposures at all, the exposures in the releases were phrased in generic, broad terms. *Id.* In contrast, Seward released Illinois Central from known and specific injuries and conditions as well as those "which may further develop in the future as a result of what now exists, arising from or as a result of the alleged exposures," which had

11

been listed in the release in specific detail. Therefore, the Court holds that the release was sufficiently specific and that it was not boilerplate.

¶22. The second question is whether the risk of developing cancer was known and contemplated by Seward at the time he signed the release. While Seward may not specifically have known he would develop anaplastic oligodemdroglioma, as stated above, cancer was clearly and specifically listed on the release. Further, Ward's complaint provides that Seward was exposed to diesel exhaust and additional chemicals and alleges that they "caused, in whole or in part," Seward's brain cancer. The release lists exposure to diesel fumes and provides a list of additional chemicals. Also, Seward checked exposure to diesel exhaust and chemicals on the pulmonary questionnaire. The release and the pulmonary questionnaire illustrate that Seward was on notice of the risk of suffering from cancer due to the listed exposures, unlike in *Sinclair*, in which the release did not specifically mention exposure to manganese poisoning. *Sinclair*, 200 P.3d at 60. Finally, Seward signed the release after his employment with Illinois Central had ended. Therefore, this suit cannot be due to an exposure to chemical or diesel fumes to which Seward had not already been exposed in 2005.

¶23. Peirce's after-the-fact testimony fails to change the specific language of the release and fails to affect the additional information and intent evidence illustrated by the pulmonary questionnaire. Thus, we hold that Peirce's testimony fails to create a genuine issue of material fact. Seward was on notice of the risk of cancer, including brain cancer, at the time he signed the release.

12

## CONCLUSION

¶24. Accordingly, the judgment of the trial court is affirmed. Summary judgment was properly granted to Illinois Central.

¶25. **AFFIRMED.**

**COLEMAN, MAXWELL, BEAM, ISHEE AND GRIFFIS, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J. RANDOLPH, C.J., NOT PARTICIPATING.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶26. Were this case governed by general contract law, I might agree with the majority's position that no genuine issues of material fact exist on whether Larry Seward waived his right to recover from Illinois Central Railroad for the brain cancer that ultimately killed him. But this case arose under the Federal Employers' Liability Act (FELA), which was intended "to provide liberal recovery for injured workers." *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 432, 78 S. Ct. 394, 2 L. Ed. 2d 382 (1958) (citing *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 508-10, 77 S. Ct. 443, 1 L. Ed. 2d 493 (1957)). Section 5 of FELA provides, in part, that "[a]ny contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void." 45 U.S.C. § 55 (2012). Although this Court has adopted the analysis of *Wicker v. Consolidated Rail Corp.*, 142 F.3d 690, 701 (3d Cir. 1998), that under section 5 an employee may release known risks, claims relating to unknown risks may not be released. *Wicker* emphasized that the inquiry into the employee's intent is fact intensive and that the written release does not control. *Id.* Here, the attorney who represented Seward in negotiating the release averred that his understanding had been that the release

13

covered Seward's lung injury claims, not future brain cancer. I find that this evidence, along with the language of the release and pulmonary questionnaire, created genuine issues of material fact on the question of whether Seward intended to release his claim for brain cancer. Therefore, I would reverse the grant of summary judgment and would remand the case for further proceedings.

¶27. In 2005 Seward entered into settlement, and, in the same year, he executed the release which provided, in part, that

> WHEREAS, the Undersigned alleges that one or more of the Releasees were negligent and/or violated the Federal Employer's Liability Act, the same being the subject of ***Bobby McElhenney, et al. v. Illinois Central Railroad*** . . . in allowing an allegedly unsafe work condition to exist that the Undersigned alleges created an exposure or exposures to asbestos, coal, coal dust, welding fumes, brass fumes, diesel fumes, dust, paint vapors, fuel fumes, methyl bromide, ammonia gas, sand, silica, Dow Clean, solvents, cleaners, degreasers, and other fumes, dusts, mites, gases, and vapors from any material, chemical, toxin or other agent. The Undersigned asserts that any such exposure caused a condition, injury, disease and/or deficiency (hereinafter, referred to as "condition") in the Undersigned including, but not limited to plaques, calcifications, thickening, pneumoconiosis including asbestosis and silicosis, severe and permanent injuries to the lungs, respiratory system, nerves and/or nervous system, cancer, and any and all other conditions, diseases or injuries existing prior to the date of this Release Agreement which are known to the Undersigned or reasonably could have been known prior to the date of this Release Agreement and which may further develop in the future as a result of what now exists, arising from or as a result of the alleged exposures or which may further develop as a result of the Undersigned's current known or unknown conditions, which allegedly developed over time while working in one or more of the releases employ, which are expressly released herein.

In conjunction with the settlement and release, Seward filled out a document titled "Pulmonary Questionnaire." Seward indicated on the Pulmonary Questionnaire that he had been exposed to asbestos, diesel exhaust, silica, solvents, degreasers, coal, chemicals, and weed spray for several hours per day, six days per week, for forty-one years. He listed his

14

known medical diagnoses as asbestosis, bronchitis, and pneumonia, all of which are respiratory diseases. In 2007, Seward was diagnosed with anaplastic oligodendroglioma, a rare form of primary brain cancer. He died in 2008, and his representative, Andrew Ward, brought this action.

¶28.    Attorney Robert N. Peirce, Jr., had represented Seward in the settlement negotiations. In an affidavit taken for this case, Peirce said that he had represented Seward "for damage to his lungs due to asbestos exposure" in a lawsuit filed in Holmes County, Mississippi, on December 19, 2002. Peirce said that he and Seward had been unaware that Seward had been exposed to "chemicals which ultimately would cause him to contract primary brain cancer, specifically anaplastic oligodendroglioma." Further, Peirce averred, he had not negotiated with Illinois Central to recover damages for injuries other than the lung injury but would have demanded additional compensation had he known Seward would develop brain cancer. Peirce said that neither he nor any other attorney had discussed with Seward the risk that he could develop primary brain cancer in the future.

¶29.    In *Illinois Central Railroad Co. v. Acuff*, 950 So. 2d 947 (Miss. 2006), this Court adopted *Wicker*'s "approach allowing the release of future claims based on specific risks known to the parties to be appropriate." *Id.* at 960. "[T]he key inquiry is whether or not the risk of developing [the claimed injury] was known and contemplated . . . at the time [the employee] signed [the] release." *Id.* In *Acuff*, we recognized that "[u]nder general contract law, parties are usually free to contract away their rights, . . . [h]owever, releases extinguishing an employee's claims for injuries under FELA are held to a higher standard . . . ." *Id.* Therefore, the language of the release is not conclusive. *Wicker*, 142 F.3d at 701.

"Where a specific known risk or malady is not mentioned in the release, it would seem difficult for the employer to show it was known to the employee and that he or she intended to release liability for it." *Id.* A release that includes a "laundry list of diseases" may be attacked as boilerplate and not reflective of the employee's intent. *Id.* Testimony by the plaintiff and affidavits of attorneys who represented the parties at the time of a settlement and release are considered relevant evidence of intent. *Acuff*, 950 So. 2d at 961 (citing *Wicker*, 142 F.3d at 695). Overall, the determination of whether a plaintiff's claim is barred by a prior release is "a fact-intensive process." *Acuff*, 950 So. 2d at 961 (quoting *Wicker*, 142 F.3d at 701).

¶30. The majority acknowledges this standard, then concludes that, even after considering the evidence in the light most favorable to the plaintiff, no genuine issues of material fact exist about Seward's intent to waive his claim for brain cancer. I would find that a proper application of the standard yields a different conclusion: that genuine issues of material fact most certainly are present in this case. The majority finds no genuine issues of material fact on whether the release was boilerplate, because Peirce did not testify that it was boilerplate, and because the release is somewhat more specific than the releases in *Wicker*. With respect to the majority, the absence of testimony from Peirce is irrelevant because the release *itself* provides sufficient evidence to enable a reasonable fact finder to conclude the release was boilerplate.[5] The release contains a laundry list of chemical exposures and diseases typical of boilerplate contractual language. In that respect, it is similar to the releases found to be

---

[5] *Boilerplate* refers to a standard form contract containing generic language. *Wallace v. United Miss. Bank*, 726 So. 2d 578, 587 (Miss. 1998).

16

boilerplate in *Wicker*. *Wicker*, 142 F.3d at 693-94, 701-02. Yet the majority usurps the fact finder role on this issue and deems the release not boilerplate as a matter of law.

¶31.     The majority then finds no genuine issue of material fact that Seward contemplated his risk of brain cancer when he executed the release, ascribing great importance to the fact that the release listed "cancer" as one of the released conditions. The majority then reasons, "[w]hile Seward may not specifically have known he would develop anaplastic oligodendroglioma, . . . cancer was clearly and specifically listed on the release." Maj. Op. ¶ 22. But the release lists "cancer" as an existing condition, not as a future condition for which Seward specifically waived liability should he develop it some time after signing the release. The release says that "any such exposure caused . . . cancer, and any and all other conditions, diseases or injuries existing *prior to* the date of this Release Agreement *which are known* to[Seward] and which may further develop in the future as a result of what now exists . . . ." (Emphasis added.) Thus, an accurate reading of the release shows that it listed "cancer" as an existing condition; future conditions effectively were unlimited and included anything "which may further develop in the future as a result of what now exists." There is no dispute that Seward was not diagnosed with brain cancer until after he had signed the release; thus, the brain cancer could have been released only if listed in the category of future claims. This release, most assuredly, did not do that; it did not specifically list cancer, let alone brain cancer, as a potential future claim.

¶32.     Even assuming that Seward should have been expected to foresee from his waiver of an existing cancer claim that he also was waiving a future cancer claim, the term "cancer" is extremely broad, encompassing a multitude of things from melanoma, a skin condition, to

17

lung cancer, to Seward's primary brain cancer. *Wicker* held that a release, to be effective, must recite the "*specific* known risk or malady." *Wicker*, 142 F.3d at 701 (emphasis added). A reasonable fact finder could conclude that the release signed by Seward lacked the requisite specificity to attribute to him an intent to waive a future claim that the chemicals to which he was exposed at Illinois Central gave him brain cancer. This is especially true considering Peirce's averment that he thought the release was limited to Seward's lung injury, that he did not discuss the risk of brain cancer with Seward before Seward signed the release, and that he was unaware that Seward had been exposed to chemicals that carried a risk of brain cancer. The majority finds that, because the release and pulmonary questionnaire listed some of the same chemicals that Ward now alleges caused Seward's brain cancer, no genuine issues of material fact exist that Seward was on notice of the risk of developing brain cancer from those exposures. But because nothing shows that Seward knew that exposure to any of those chemicals carried a risk of brain cancer, I reject that analysis and would allow the fact finder to make the determination of what Seward knew when he signed the release.

¶33.    The majority relies on two cases that found summary judgment was warranted based on the employee's waiver of a known risk. In *Jaqua v. Canadian National Railroad, Inc.*, 734 N.W. 2d 228 (Mich. Ct. App. 2007), much more evidence was presented than was addressed here that the employee knew of the specific risk before signing the release. The employee had signed a release similar to the release in this case; he released all claims for existing cancer and for diseases that "may further develop in the future as a result of what now exists." *Id.* at 230. The Court of Appeals of Michigan adopted *Wicker*'s known-risk approach and found that summary judgment was appropriate on a lung cancer claim brought

18

by the employee's estate. *Id.* at 555-56. Critically, it was undisputed that, before the employee had signed the release, his physician had informed him that he was at risk of developing lung cancer. *Id.* at 542. No such information was given to Seward in advance of his signing the release.

¶34. And in *Blackwell v. CSX Transportation, Inc.*, 102 A.3d 864 (Md. Ct. Spec. App. 2014), the release itself was much more specific than the release at issue here. The release provided that Blackwell "release[d] and forever discharge[d]" the employer from liability from a claim that he had been exposed to "repetitive stress and cumulative trauma [that] allegedly caused [him] to suffer knee injuries and other injuries, disorders, or diseases of the lower extremities." *Id.* at 866 (third and fourth alterations in original). And the release provided that a substantial portion of the consideration paid to Blackwell had been to compensate him for "the possibility of . . . the development of any new or additional repetitive stress or cumulative trauma injury either presently existing or that may arise in the future to the lower extremities or other body parts." *Id.* Blackwell had consulted with counsel before signing the release. *Id.* Thus, when Blackwell developed bilateral plantar fasciitis, a foot condition that he claimed had been caused by repetitive trauma on the job, the court found that the injury specifically was covered by the language of the release. *Id.* at 873. Unlike in this case, the release in *Blackwell* was quite specific and was tailored to cover the exact kind of injury that Blackwell later claimed had arisen from his job duties, namely, a repetitive stress injury to the lower extremities.

¶35. I find that genuine issues of material fact exist on whether the release signed by Larry Seward was boilerplate and whether at the time Seward signed the release he knew and

19

contemplated the risk that his chemical exposures would culminate in brain cancer. Therefore, I would reverse the judgment of the Circuit Court of DeSoto County and would remand the case for trial.

**KING, P.J., JOINS THIS OPINION.**